# 09-MC-60160-Dimitrouleas-Rosenbaum

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. _____-Civ (_____)

| | |
|---|---|
| )<br>IN RE APPLICATION OF DIGICEL )<br>LIMITED ET AL. FOR AN ORDER TO )<br>CONDUCT DISCOVERY FOR USE )<br>IN A FOREIGN JURISDICTION )<br>PURSUANT TO 28 U.S.C. § 1782 )<br>) | FILED by **VT** D.C.<br>ELECTRONIC<br><br>**Jan. 29, 2009**<br><br>STEVEN M. LARIMORE<br>CLERK U.S. DIST. CT.<br>S.D. OF FLA. - MIAMI |

### MEMORANDUM OF LAW IN SUPPORT OF DIGICEL LIMITED ET AL.'S APPLICATION FOR DISCOVERY PURSUANT TO 28 U.S.C. § 1782 IN AID OF A FOREIGN PROCEEDING

Pursuant to 28 U.S.C. § 1782, Petitioners Digicel Limited, Digicel (St. Lucia) Limited, Digicel (SVG) Limited, Digicel Grenada Limited, Digicel (Barbados) Limited ("Digicel Barbados"), Digicel Cayman Limited, Digicel (Trinidad & Tobago) Limited ("Digicel Trinidad & Tobago"), and Digicel (Turks & Caicos) Limited ("Digicel Turks & Caicos") (collectively, "the Digicel Petitioners"), submit this accompanying Memorandum of Law in support of their application for discovery in aid of a foreign proceeding. For the reasons set forth below, the Digicel Petitioners respectfully requests that the Court authorize the Digicel Petitioners or their attorneys to serve a subpoena for documents, pursuant to Rule 45 of the Federal Rules of Civil Procedure, upon Respondent Nortel Networks (CALA), Inc.

## STATEMENT OF FACTS

### A. The Digicel Petitioners Have Brought An Action Against Cable & Wireless In London, England.

The Digicel Petitioners seek discovery in connection with their action pending in London, England (the "London Proceedings") against Cable & Wireless PLC, Cable & Wireless (West Indies) Limited, Cable & Wireless Grenada Limited, Cable & Wireless (Barbados)

Limited, Cable & Wireless (Cayman Islands) Limited, and Telecommunications Services of Trinidad & Tobago Limited (collectively, "Cable & Wireless"). The focus of the London Proceedings is a dispute about the process of "interconnection" between the Digicel Petitioners' new mobile telecommunications networks and the existing fixed-line networks owned and operated by Cable & Wireless. In order for a new telecommunications network provider to launch itself and operate effectively in a territory, it is necessary to interconnect with the network or networks belonging to the existing fixed network providers. Interconnection is vital to the launch of a new network in any liberalized telecommunications market; without interconnection between networks, it is physically impossible for subscribers to one network to communicate with subscribers to any other network. The Digicel Petitioners allege in their action that they have been the direct and intended victim of a coordinated effort on the part of Cable & Wireless to impede and delay the Digicel Petitioners' launch of competing mobile networks in various English-speaking Caribbean territories ("the territories"), including Barbados, Trinidad & Tobago, and the Turks & Caicos Islands. The dispute concerns the period from about mid-2002 to about mid-2006 ("the relevant period").

Prior to the relevant period, Cable & Wireless, the incumbent operator, enjoyed a guaranteed monopoly in the telecommunications markets in each of the territories with respect to both fixed-line and mobile networks. Starting in about 2000, these telecommunications markets were liberalized by the relevant governments through legislation pursuant to which Cable & Wireless was required to obtain and operate under the terms of non-exclusive licenses, while new entrants were permitted to bid to operate rival telecommunications networks and thereby compete with Cable & Wireless for subscribers and call revenues.

This action concerns Cable & Wireless's attempts, by way of an alleged deliberate strategy, to keep the Digicel Petitioners out of or, failing this, to delay the Digicel Petitioners' entry into, the telecommunications markets in the territories. The Digicel Petitioners allege that such attempts were unlawful; were conceived in England by Cable & Wireless PLC and Cable & Wireless (West Indies) Limited ("Cable & Wireless West Indies"), both English registered companies; and were given effect in each of the territories by one or more of the Defendants including Cable & Wireless (Barbados) Limited ("Cable & Wireless Barbados") and Telecommunications Services of Trinidad & Tobago Limited ("TSTT"). Accordingly, the Digicel Petitioners seek damages and associated relief against Cable & Wireless on the grounds of tortious conduct committed by Cable & Wireless jointly and pursuant to a conspiracy orchestrated and overseen from England.

The trial in the London Proceedings is scheduled to commence in late April 2009 (the exact commencement date has yet to be determined) with a time estimate of twelve weeks.

**B.    The Discovery That The Digicel Petitioners Seek From Nortel Networks (CALA), Inc. Is Needed In the London Proceedings.**

One example of Cable & Wireless's attempts to delay the Digicel Petitioners' entry into the telecommunications markets concerns the manipulation of timeframes for delivery of equipment supplied by Nortel Networks (CALA), Inc. for the interconnection process.[1] With respect to the Barbados market, the Digicel Petitioners assert that Cable & Wireless Barbados should have been able to obtain the necessary equipment significantly faster than it did and that the timeframes provided for equipment delivery were designed by Cable & Wireless Barbados and Nortel Networks (CALA), Inc. to delay delivery. In Trinidad & Tobago, the Digicel

---

[1] Express allegations in this respect are made only against Cable & Wireless Barbados, TSTT, and Cable & Wireless West Indies.

Petitioners assert that TSTT exerted influence over Nortel Networks (CALA), Inc. to slow the delivery of equipment and/or extend the date for delivery. In the Turks & Caicos Islands, the Digicel Petitioners assert that Cable & Wireless West Indies misrepresented the position with respect to the Nortel equipment that was available and required for interconnection and delayed ordering equipment thereafter (caused by issues connected with Nortel Networks (CALA), Inc. including an excessive equipment delivery timetable). The Digicel Petitioners accordingly believe that Respondent Nortel Networks (CALA), Inc. may possess documents which support these allegations.

Because Nortel Networks (CALA), Inc. served as the manufacturer and supplier of the interconnection equipment necessary for the Digicel Petitioners to connect to Cable & Wireless's networks, the Digicel Petitioners believe the documents described below in Nortel Networks (CALA), Inc.'s possession will support and substantiate the Digicel Petitioners' allegations that Cable & Wireless worked to impede and delay the Digicel Petitioners' entry into various telecommunications markets.

The Digicel Petitioners' understanding as to the relevance of the individuals named below derives from conversations with potential witnesses, documents produced by Cable & Wireless in the London Proceedings' equivalent of documentary discovery and documents within its own possession and control. Upon information and belief, the relevant individuals who represented Nortel Networks (CALA), Inc. in its day-to-day communications and contact with Cable & Wireless Barbados and/or were responsible for Nortel Networks (CALA), Inc.'s relationship with Cable & Wireless Barbados during the relevant period were Mr. Jeff Lunsford (Vice President Cable & Wireless Global Account for Nortel Networks (CALA), Inc.) and Mr. Harold Seaman (Cable & Wireless Account Manager for Nortel Networks (CALA), Inc.). The

relevant individuals who represented Nortel Networks (CALA), Inc. in its day-to-day communications and contact with TSTT and/or were responsible for Nortel Networks (CALA), Inc.'s relationship with TSTT during the relevant period were Ms. Martha Bejar (President of Nortel Networks (CALA), Inc.), Mr. Kevin Taylor (Vice President, Mobile, of Nortel Networks (CALA), Inc.), Mr. Tony Davy (TSTT Account Manager of Nortel Networks (CALA), Inc.), Mr. Luch Naccarato, Mr. Cameron Holden, Mr. Ray Bulengo and Mr. Norberto Milan.  Finally, upon information and belief, the relevant individuals who represented Nortel Networks (CALA), Inc. in its day-to-day communications and contact with Cable & Wireless West Indies in the Turks & Caicos Islands and/or were responsible for Nortel Networks (CALA), Inc.'s relationship with Cable & Wireless West Indies during the relevant period were Mr. Rafael Buigas (Network Architect – Cable & Wireless, CALA Wireless Network Engineering), Mr. Harold Seaman and Ms. Nora Winje.

The Digicel Petitioners seek three categories from Nortel Networks (CALA), Inc.  First, the Digicel Petitioners seek documents by, to, and/or from Mr. Jeff Lunsford (Vice President Cable & Wireless Global Account) and Mr. Harold Seaman (Cable & Wireless Account Manager for Nortel Networks (CALA), Inc.) between March 12, 2003 and February 11, 2004 (the duration of the Barbados interconnection process) concerning the order of Nortel telecommunications equipment by Cable & Wireless Barbados in relation to Digicel Barbados's interconnection with Cable & Wireless Barbados's telecommunications networks, including but not limited to documents relating to:

- The forecasting of such equipment needs by Nortel and Cable & Wireless Barbados for liberalization of Barbados' mobile telecommunications market;

- The evaluation of equipment required further to Digicel Barbados' request for interconnection from March 12 2003;

- The ordering, manufacturing and delivery of such equipment (including the timeframes for the same and delays in the process); and

- The consideration of the suitability of equipment offered by Digicel Barbados to Cable & Wireless Barbados for use in Barbados for the purpose of effecting interconnection.

Second, the Digicel Petitioners seek documents by, to, and/or from Ms. Martha Bejar, Mr. Kevin Taylor, Mr. Tony Davy, Mr. Luch Naccarato, Mr. Cameron Holden, Mr. Ray Bulengo, and Mr. Norberto Milan between June 23, 2005 and April 6, 2006 (the duration of the interconnection process in Trinidad & Tobago) concerning the order of Nortel telecommunications equipment by TSTT in relation to Digicel Trinidad & Tobago's interconnection with TSTT's telecommunications networks, including but not limited to documents relating to:

- The forecasting of such equipment needs by Nortel and TSTT for liberalization of Trinidad & Tobago's mobile telecommunications market;

- The evaluation of equipment required further to Digicel Trinidad & Tobago's requests for interconnection from June 23 2005;

- The information required from Digicel Trinidad & Tobago and/or TSTT in order to carry out this forecasting and evaluation;

- The ordering, manufacturing, delivery (including means) and installation of such equipment (including the timeframes for the same and delays in the process);

- The capability of TSTT's network to support the possible technical configuration for interconnection to Digicel Trinidad & Tobago, including any requirements to take steps or to refrain from action to implement them, and Nortel's ability to assist in that regard; and

- The effect of TSTT's network expansion and upgrade on Digicel Trinidad & Tobago's interconnection with TSTT's telecommunications networks.

Third, the Digicel Petitioners seek documents by, to, and/or from Mr. Rafael Buigas, Mr. Harold Seaman (Cable & Wireless Account Manager for Nortel Networks (CALA), Inc.) and/or Ms. Nora Winje between August 19, 2005 and July 7, 2006 (the duration of the interconnection

process in the Turks & Caicos Islands) concerning the order of Nortel telecommunications equipment by Cable & Wireless West Indies in relation to Digicel Turks & Caicos' interconnection with Cable & Wireless West Indies' telecommunications networks, including but not limited to documents relating to:

- The forecasting of such equipment needs by Nortel and Cable & Wireless West Indies for liberalization of the Turks & Caicos Islands' mobile telecommunications market;

- The evaluation of equipment required further to Digicel Turks & Caicos' request for interconnection from August 19 2005;

- The ordering, manufacturing and delivery of such equipment (including the timeframes for the same and delays in the process); and

- The consideration of the suitability of equipment offered by Digicel Turks & Caicos to Cable & Wireless West Indies for use in the Turks & Caicos Islands for the purpose of effecting interconnection.

Accordingly, the Digicel Petitioners seek a limited number of documents involving communications between a handful of Nortel and Cable & Wireless employees that are directly relevant to the issues in dispute in the London Proceedings.

## ARGUMENT

**A.    This Court May Order Discovery In Aid Of The London Litigation.**

A federal district court is authorized to provide judicial assistance in a foreign proceeding under 28 U.S.C. § 1782, which provides in pertinent part:

> (t)he district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in foreign or international tribunal.  The order may be made pursuant to . . . the application of any interested person (and) . . . (t)o the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure.

28 U.S.C. § 1782(a) (Supp. 2003). Section 1782 serves the dual policy purposes of improving efficient international judicial assistance from the United States courts and encouraging foreign courts to act in a similar fashion to requests for assistance from United States courts. *See, e.g., In re Application of Bayer AG*, 146 F.3d 188, 191 (3d Cir. 1998) (citing S. Rep. 88-1580, at 2 (1964)). Section 1782 incorporates the full scope of discovery available under the Federal Rules. *See Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 248 (2004); *Weber v. Finker*, --- F.3d ----, 2009 WL 91807 at *4 (11th Cir. Jan. 15, 2009).

To obtain discovery in aid of a foreign litigation, a petitioner must show only that: (1) the person to provide discovery resides in the district where the application is made; (2) the information sought is "for use in a proceeding in a foreign or international tribunal;" and (3) the petitioner is an "interested person" in the foreign proceeding. *See* 28 U.S.C. § 1782(a); *see also In re Clerici*, 481 F.3d 1324, 1332-32 (11th Cir. 2007).

**B.      The Digicel Petitioners Satisfy Each Of The Three Statutory Requirements For An Order Under 28 USC § 1782.**

The Digicel Petitioners satisfy the first requirement that the respondent reside within this Court's district because Nortel Networks (CALA), Inc. is headquartered in the city of Sunrise.

The Digicel Petitioners satisfy the second requirement because the information is relevant to a proceeding ongoing in a foreign tribunal in the London Proceedings. The Digicel Petitioners allege, among other claims, that Cable & Wireless attempted to obstruct or delay the Digicel Petitioners' entry into the telecommunications markets in the territories. The Digicel Petitioners expect that Nortel Networks (CALA), Inc. may provide valuable information relating to the ordering and delivery of Nortel-supplied equipment required to enable the Digicel Petitioners to physically interconnect with Cable & Wireless's networks.

Finally, the Digicel Petitioners fulfill the "interested person" requirement because they are a party to the underlying action. *See Intel Corp.*, 542 U.S. 241 at 256 (acknowledging that litigants may be the most common example of an "interested person").

**C.     The Court Should Exercise Its Discretion To Grant Discovery.**

An important purpose of the statute is to facilitate the collection of evidence for use before a foreign tribunal. *See In re Bayer*, 146 F.3d at 191-94. Granting the Digicel Petitioners' application would significantly assist in the resolution of the underlying action and would be consistent with the policy goals of the statute.

A district court has broad discretion to grant judicial assistance in foreign proceedings under 28 U.S.C. § 1782(a). *In re Clerici*, 481 F.3d at 1331. Once the statutory requirements are satisfied, the following factors weigh in favor of exercising the discretion granted under § 1782(a): (1) the person from whom discovery is sought is not a participant in the foreign proceeding; (2) the foreign court is receptive to providing U.S. federal court's with assistance; (3) the § 1782(a) does not conceal an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States; and (4) the request is not otherwise unduly intrusive or burdensome. *Id.* at 1334 (citing *Intel Corp.*, 542 U.S. at 264-65).

Each of these factors weighs in favor of the court granting judicial assistance here. First, neither Nortel Networks (CALA), Inc. nor its employees are based in the United Kingdom, and neither Nortel Networks (CALA), Inc. nor its employees are participants in the London Proceedings. Accordingly, in this context Nortel Networks (CALA), Inc. cannot be required by the English court to provide discovery. *See id.* at 1334 (§1782 assistance is not necessary where a foreign tribunal has jurisdiction over those appearing before it and can itself order them to produce evidence). Next, the United Kingdom and the United States have a long history of providing and receiving legal assistance from one another. *See, e.g., United Kingdom v. U.S.*,

238 F.3d 1312 (11th Cir. 2001).  Third, this request does not conceal an attempt to circumvent foreign proof-gathering restrictions or other policies.  Finally, the document request is narrow in scope and is not unduly intrusive or burdensome.

### CONCLUSION

For the foregoing reasons, the Digicel Petitioners respectfully request that this Court authorize the Digicel Petitioners or their attorneys to issue and serve a subpoena pursuant to Rules 34 and 45 of the Federal Rules of Civil Procedure, compelling Nortel Networks (CALA), Inc. to produce documents.

January 29, 2009

Respectfully submitted,

FOR/Brian G. Rich  #31438
Fla. Bar ID No. 038229
brich@bergersingerman.com
BERGER SINGERMAN
350 East Las Olas Boulevard, Suite 1000
Fort Lauderdale, FL 33301
Tel: (954) 525-9900
Fax: (954) 523-2872

Mark J. Andreini
mjandreini@jonesday.com
JONES DAY
901 Lakeside Avenue
Cleveland, OH  44114
Tel: (216) 586-7101
Fax: (216) 579-0212
*Pro Hac Admission Pending*

Counsel for the Digicel Petitioners

# EXHIBIT 1

January 23, 2009

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

|  |  |
|---|---|
| )<br>IN RE APPLICATION OF DIGICEL )<br>LIMITED ET AL. FOR AN ORDER TO )<br>CONDUCT DISCOVERY FOR USE )<br>IN A FOREIGN JURISDICTION )<br>PURSUANT TO 28 U.S.C. § 1782 )<br>) | Civil Action No.: |

### AFFIDAVIT OF NICHOLAS PAUL COTTER

Nicholas Paul Cotter, being duly sworn, deposes and says:

1.     I am a solicitor at Jones Day, a law firm located in London, England.  I was educated and trained at the University of Oxford, where I obtained a degree in law, and subsequently the College of Law in London, where I successfully completed the Legal Practice Course.  In 1997, I was admitted as a solicitor to the Supreme Court of England and Wales.  My expertise and experience has been mainly in litigation.  My firm acts for Digicel Limited, Digicel (St. Lucia) Limited, Digicel (SVG) Limited, Digicel Grenada Limited, Digicel (Barbados) Limited, Digicel Cayman Limited, Digicel (Trinidad & Tobago) Limited, and Digicel (Turks & Caicos) Limited (collectively, "Digicel ") in the English courts in connection with the proceedings against Cable & Wireless PLC, Cable & Wireless (West Indies) Limited, Cable & Wireless Grenada Limited, Cable & Wireless (Barbados) Limited, Cable & Wireless (Cayman Islands) Limited, and Telecommunications Services of Trinidad & Tobago Limited (collectively, "Cable & Wireless") relating to the interconnection between Digicel's new mobile telecommunications networks and the existing fixed-line networks owned and operated by Cable & Wireless ("underlying action").  I am fully familiar with the facts set forth herein.  I submit

this Affidavit in support of Digicel's Application for an Order to Conduct Discovery for Use in a

Foreign Jurisdiction Pursuant to 28 U.S.C. § 1782.

2.      The allegations of Digicel in the underlying action are set forth in the Amended

Particular of Claims and its relevant Schedules B4, B6 and B7, true and correct copies of which

are attached hereto as Exhibits A, B, C and D.  Digicel and Cable & Wireless are parties to the

underlying action.  *See* Ex. A, at ¶¶ 6-7, 8-13.

3.      In the underlying action, Digicel allege in part that Cable & Wireless attempted,

by way of an alleged deliberate strategy impede or delay Digicel's entry into the

telecommunications markets in various English-speaking Caribbean territories.  *See* Ex. A, at ¶

31.  Specifically, Digicel allege Cable & Wireless's attempts to impede Digicel's entry into the

telecommunications markets in Barbados, Trinidad & Tobago, and the Turks & Caicos Islands

included delays in obtaining equipment supplied by Nortel Networks (CALA), Inc. — equipment

required to enable Digicel to physically interconnect with Cable & Wireless's network and

thereby transmit mobile traffic.  In Barbados, Digicel assert that Cable & Wireless Barbados

should have been able to obtain the necessary equipment significantly faster than it did and acted

with Nortel Networks (CALA), Inc. to lengthen the interconnection process by producing

exaggerated lead-times for delivery of the necessary equipment.  *See* Ex. B, at ¶ 3.28(a).

Similarly, in Trinidad & Tobago, Digicel asserts that Telecommunications Services of Trinidad

& Tobago Limited exerted influence over Nortel Networks (CALA), Inc. to slow the equipment

ordering process and the delivery of equipment.  *See* Ex. C, at ¶ 4.2(q).  Similarly, in the Turks &

Caicos Islands, Digicel assert that Cable & Wireless (West Indies) Limited misrepresented the

position in respect of the Nortel equipment that was available and required for interconnection,

delayed ordering equipment thereafter (caused by issues with Nortel Networks (CALA), Inc.

including the provision of an excessive delivery timetable by it), Inc. *See* Ex. D, at ¶¶ 3.20 and 3.33(a).

4.     As alleged in Schedules B4, B6, and B7, the interconnection equipment necessary to physically connect Digicel to Cable & Wireless' networks was ordered from, manufactured, and supplied by Nortel Networks (CALA), Inc. *See* Ex. B, at ¶ 3.19 & ¶ 3.28; Ex. C., at ¶ 3.38(d); Ex. D., at ¶ 3.9A(d). See also the exemplar Purchase and License Agreement listing Nortel Networks (CALA), Inc. as a contracting entity, a true and correct copy of which is attached hereto at Exhibit F.

5.     Attached hereto as Exhibit A is a true and correct copy of Claim No. HC07C01917, Amended Particular of Claims.

6.     Attached hereto as Exhibit B is a true and correct copy of Claim No. HC07C01917, Amended Particulars of Claim, Schedule B4.

7.     Attached hereto as Exhibit C is a true and correct copy of Claim No. HC07C01917, Amended Particulars of Claim, Schedule B6.

8.     Attached hereto as Exhibit D is a true and correct copy of Claim No. HC07C01917, Amended Particulars of Claim, Schedule B7.

9.     Attached hereto as Exhibit E is a true and correct copy of Claim No. HC07C01917, Amended Defence.

10.     Attached hereto as Exhibit F is a true and correct copy of a Purchase and License Agreement.

Nicholas Paul Cotter

Subscribed and Sworn to before me
at the office of Messrs.

**CHEESWRIGHTS**
NOTARIES PUBLIC

Bankside House, 107 Leadenhall Street,
London  EC3A 4AF
Telephone: 020 7623 9477
Facsimile:  020 7623 5428

this __23__ day of January, 2009.

in the presence of:

Ruth M. Campbell

Notary Public London, England
(RUTH M. CAMPBELL)

My Commission Expires with Life

4

This is Exhibit "A"
referred to in the affidavit of NICHOLAS PAUL COTTER
sworn before me this 23rd day of January 2009

*Ra N. Campbell*

Notary Public
London, England
(RUTH M. CAMPBELL)

My Commission Expires with Life

January 23, 2009

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

|  |  |
|---|---|
| ) | **Civil Action No.:** |
| **IN RE APPLICATION OF DIGICEL** ) | |
| **LIMITED ET AL. FOR AN ORDER TO** ) | |
| **CONDUCT DISCOVERY FOR USE** ) | |
| **IN A FOREIGN JURISDICTION** ) | |
| **PURSUANT TO 28 U.S.C. § 1782** ) | |
| ) | |

### EXHIBIT A TO AFFIDAVIT OF NICHOLAS PAUL COTTER

AMENDED PURSUANT TO THE ORDER OF MASTER PRICE DATED 19 MARCH 2008

<u>**Claim Number HC07C01917**</u>

## <u>IN THE HIGH COURT OF JUSTICE</u>
## <u>CHANCERY DIVISION</u>

**B E T W E E N:**

**(1) DIGICEL (ST. LUCIA) LIMITED**
(A company registered under the laws of St. Lucia)

**(2) DIGICEL (SVG) LIMITED**
(A company registered under the laws of St. Vincent & the Grenadines)

**(3) DIGICEL GRENADA LIMITED**
(A company registered under the laws of Grenada)

**(4) DIGICEL (BARBADOS) LIMITED**
(A company registered under the laws of Barbados)

**(5) DIGICEL CAYMAN LIMITED**
(A company registered under the laws of the Cayman Islands)

**(6) DIGICEL (TRINIDAD & TOBAGO) LIMITED**
(A company registered under the laws of Trinidad & Tobago)

**(7) DIGICEL (TURKS & CAICOS) LIMITED**
(A company registered under the laws of Turks & Caicos)

**(8) DIGICEL LIMITED**
(A company registered under the laws of Bermuda)

<u>Claimants</u>

- and -

**(1) CABLE & WIRELESS PLC**

**(2) CABLE & WIRELESS (WEST INDIES) LIMITED**

**(3) CABLE & WIRELESS GRENADA LIMITED**
(A company registered under the laws of Grenada)

**(4) CABLE & WIRELESS (BARBADOS) LIMITED**
(A company registered under the laws of Barbados)

**(5) CABLE & WIRELESS (CAYMAN ISLANDS) LIMITED**
(A company registered under the laws of the Cayman Islands)

**(6) TELECOMMUNICATIONS SERVICES OF**
**TRINIDAD & TOBAGO LIMITED**
(A company registered under the laws of Trinidad & Tobago)

<u>Defendants</u>

---

## AMENDED PARTICULARS OF CLAIM

---

**Summary of Claim**

1.  In these proceedings, the Claimants (together "Digicel") seek damages and associated relief from the Defendants (together "C&W") for (1) conspiracy to commit breaches of statutory duty (i.e. unlawful means conspiracy) and/or (2) primary or joint liability for the commission of breaches of statutory duty, as more fully explained below.

2.  As set out below, the claims arise out of C&W's coordinated and joint conduct during the period from about mid-2002 up to about mid-2006 (hereafter "the Relevant Period") whereby C&W, operating through one or more of their number in each relevant market or territory, have acted so as to impede and delay Digicel's entry into various mobile telecommunications markets in the English-speaking Caribbean.

3.  The relevant territories are as follows:

    3.1    St. Lucia;

    3.2    St. Vincent & the Grenadines ("SVG");

    3.3    Grenada;

    3.4    Barbados;

    3.5    the Cayman Islands ("Cayman");

    3.6    Trinidad & Tobago ("T&T"); and

    3.7    the Turks & Caicos Islands ("TCI").

    (These are referred to below collectively as "the Territories".)

4.  In short, Digicel allege in these proceedings that they have been the direct and intended victim of a coordinated effort on the part of C&W to impede and delay Digicel's launch of competing mobile networks in each of the Territories. This conduct was overseen by the First Defendant ("C&W plc") and the Second Defendant ("CWWI") within England where their respective boards of directors and senior management habitually convene and control the international business of C&W. In three territories, CWWI operated directly as the relevant telecommunications licence-holder and network-operator, namely: St. Lucia (as holder of the relevant

fixed network licence), SVG (as holder of the relevant fixed network licence), and TCI (as holder of the relevant fixed and mobile network licences, acting through a local branch).  In the remaining four territories, C&W acted through local companies (i.e. the Third to Sixth Defendants, referred to collectively as "the Local C&W Companies") whose conduct was directly or indirectly controlled and/or influenced in whole or in part by CWWI and C&W plc at all material times.

**The Parties and Related Entities**

5.      The parties and related entities are identified and defined in **Schedule "A"** attached hereto.  Relevant definitions are adopted below.

*Digicel – Claimants and related entities*

6.      At all material times since about 2000, Digicel have carried on business as mobile telecommunications operators/providers in the Caribbean region.   The relevant Digicel operating and licence-holding companies in each of the Territories, as defined in **Schedule "A"** hereto, are as follows:

6.1      Digicel SLU (the First Claimant) – licensed and operating in St. Lucia since 2002/2003;

6.2      Digicel SVG (meaning the Second Claimant and the Eighth Claimant unless the context indicates otherwise) – licensed and operating in SVG since 2002/2003;

6.3      Digicel Grenada (the Third Claimant) – licensed and operating in Grenada since 2003;

6.4      Digicel Barbados (the Fourth Claimant) – licensed and operating in Barbados since 2003/2004;

6.5      Digicel Cayman (the Fifth Claimant) – licensed and operating in Cayman since 2003/2004;

6.6    Digicel T&T (the Sixth Claimant) – licensed and operating in T&T since 2005/2006; and

6.7    Digicel TCI (the Seventh Claimant) – licensed and operating in TCI since 2005/2006.

(Schedules "B1" to "B7" hereto contain details of each of these companies, respectively, and relevant key individuals in the context of each of the Territories.)

7.    Unless the context suggests otherwise below, references to "Digicel" are intended to refer to the Claimants collectively or, as the case may be, to the relevant Digicel group entity or entities most relevant to the context.

## C&W – Defendants and related entities

8.    At all material times, C&W have been involved in telecommunications and information technology related business around the globe from their principal centre of operations in London.  In particular for present purposes, C&W have at all material times provided services as fixed and mobile telecommunications operators/providers in each of the Territories and elsewhere in the Caribbean region, such business being coordinated by or through CWWI and C&W plc in London.

9.    Prior to the dates and events described below in relation to each of the Territories, C&W enjoyed a guaranteed monopoly in such telecommunications markets.  C&W had enjoyed this privileged position for almost a century in the region.  C&W's monopolies in each market covered both fixed-line (i.e. land-line, often referred to as "fixed") networks as well as mobile (or cellular) networks, although the extent of C&W's respective networks and customer subscription varied between each of the Territories.  This business was traditionally very profitable for C&W, accounting for a significant proportion of the revenue/profit generated by C&W's entire worldwide operations during the years immediately preceding and at the beginning of the Relevant Period.

10. The C&W-related entities which have operated in the Territories, as defined in **Schedule "A"** hereto, are as follows (in each case referring to operations after the introduction of the relevant statutory non-exclusive licensing regime):

    10.1 CWWI (the Second Defendant) - licensed (fixed only) and operating directly in St. Lucia since 2001; licensed (fixed only) and operating directly in SVG since 2001; licensed (fixed and mobile) and operating directly (through a local branch) in TCI since 2005/2006;

    10.2 Cable & Wireless Caribbean Cellular (St. Vincent and the Grenadines) Limited ("C&W SVG") – licensed (mobile only) and operating alongside CWWI in SVG since 2001;

    10.3 C&W Grenada (the Third Defendant) - licensed and operating in Grenada since 2001;

    10.4 C&W Barbados (the Fourth Defendant) - licensed (fixed and mobile) and operating in Barbados since 2002;

    10.5 C&W Cayman (the Fifth Defendant) - licensed and operating in Cayman since 2003; and

    10.6 TSTT (the Sixth Defendant) - licensed and operating in T&T since 2005.

**(Schedules "B1" to "B7"** hereto contain details of each of these companies, respectively, and relevant key individuals in the context of each of the Territories.)

11. At all material times, each of the Local C&W Companies (save for TSTT) was wholly or majority owned by CWWI and each of them (including TSTT) was controlled in whole or in part by CWWI and C&W plc. As regards TSTT:

    11.1 TSTT is and has at all material times been 49% owned by CWWI, with the remaining 51% owned by the state of T&T through a majority-owned company known as NEL;

11.2    The board of directors of TSTT has included at all material times at least three members representing CWWI or C&W plc, some or all of whom have (at any given time during the Relevant Period) also been directors or officers of CWWI and/or C&W plc and/or other Local C&W Companies;

11.3    TSTT operates C&W's bMobile branded mobile telecommunications service in T&T.

12.    At all material times, and so far as relevant, C&W plc is and has been the ultimate holding and controlling entity within the C&W international group of companies.  In particular, C&W plc was and remains the indirect parent company of CWWI through the following intermediate UK-registered holding companies, namely: Sable Holding Limited (incorporated in October 2003 and wholly owned by C&W plc until at least 8 October 2006) and Cable & Wireless International Group Limited, formerly known as Cable & Wireless (Americas) Limited (wholly owned by Sable Holding Limited until at least 29 October 2006).

13.    Unless the context suggests otherwise below, references to "C&W" are intended to refer to the Defendants collectively or, as the case may be, the C&W group or related entity or entities most relevant to the context.

**Background:  Telecommunications Markets, Regulation and Network Interconnection**

14.    As explained more fully below, starting in about 2000, the telecommunications markets in each of the Territories were liberalised pursuant to statutory reform and the introduction of new regulatory and non-exclusive licensing regimes: see **Schedule "A"** hereto.

15.    Pursuant to the relevant (primary and secondary) legislation enacted in each of the Territories, including legislation promoting and protecting competition more generally in such territories, steps were taken to introduce and protect competition in both fixed and mobile telecommunications markets.  These reforms removed C&W's historic monopoly in such markets.  C&W were required to obtain and operate under the terms of non-exclusive licences or concessions awarded to them in each territory

in anticipation of the introduction of competition. New entrants, such as Digicel, were also permitted to bid for operating frequency (known as "spectrum") and licences/concessions to operate rival (fixed and/or mobile) networks in competition with C&W in each territory.

16.     In order for a new telecommunications network provider to launch itself and operate effectively in a territory, it is necessary to interconnect with the network or networks (i.e. physical infrastructure) belonging to the existing or incumbent fixed network provider(s), through which the new entrant's subscribers can then communicate to all subscribers on the incumbent's fixed network and any other operator (including the incumbent's own mobile operator) also interconnected to that fixed network. In the case of each of the Territories, there was only one incumbent network provider at the time Digicel sought to enter the mobile telecommunications market (namely, C&W) by reason of C&W's historic monopolies in respect of both fixed and mobile telecommunications in such territories.

17.     Interconnection is vital to the launch of a new network in any liberalised telecommunications market. Without interconnection between networks, it is not physically possible for subscribers to one network to communicate with subscribers to any other network. Interconnection, both literally and legally speaking, allows inter-network calls to be made and relevant call charges to be collected and apportioned by or as between network providers. Interconnection is also necessary to allow calls to be made between a fixed network and a mobile network owned/operated by the same entity, such as C&W.

18.     In the absence of interconnection between competing networks there would be no prospect for a new entrant to make its (mobile) network commercially viable: customers would not be attracted to a service which limited calls to and from other subscribers on the same (mobile) network, especially where such network is newly launched and therefore likely to have a small number of subscribers relative to the existing population of subscribers on the established network(s). Interconnection is, therefore, essential for competition within a liberalised telecommunications market.

19.     By way of background, the process of interconnection involves both physical and contractual aspects:

19.1    Physical Interconnection

19.1.1. Without physical interconnection between the two networks, it is not possible for telephone calls to be transmitted or carried from one network, in which the call originates (referred to as the "originating" network, provider or operator) or through which the call transits, into/onto the other network, in which the call terminates (referred to as the "terminating" network, provider or operator).

19.1.2. Nor is it possible, in the absence of interconnection, for calls originating from outside the relevant territory to be connected to a new mobile network within the territory (such calls being known as incoming international calls to mobiles or IICMs), unless such network is specifically licensed to receive such calls through its own main switch via satellite transmission or international submarine telecommunications cables.   In the absence of its own main/international switch, the new mobile network would be reliant upon the existing fixed/mobile networks (which would include a main/international switch) to receive IICMs, through what is known as 'transit' across the latter network.   However, as with domestic inter-network calls (described above) this can only be achieved if the two networks are interconnected.

19.1.3. Physical interconnection is an engineering process.   The process includes installation of specific equipment within both the existing network infrastructure and the new network infrastructure linking the two networks together.  This permits the flow of call traffic between the connected networks.  The key equipment includes a Multiplexor (or 'MUX' box), which is made/supplied by specialist manufacturers such as Nortel or Ericsson, fitted on each side of the interconnection

point and joined together by fibre cable. (The point of interconnection on each network is often referred to as "the interconnection switch" in order to distinguish it from other switches or exchanges within the respective networks.)

19.2    Contractual Interconnection

19.2.1. Agreement (express or implied) between network operators is essential. Without an interconnection agreement between the respective network providers, there is no agreed basis for (a) physical interconnection (as described above), (b) the parties' respective rights and responsibilities pursuant to interconnection, or (c) the allocation of call revenue between the two providers in respect of inter-network calls made pursuant to interconnection.

19.2.2. The need for allocating or dividing revenue for inter-network calls arises from the fact that physical elements of both networks are utilised in order for the call to be made and received. This gives rise to the need for the respective network operators first to agree and thereafter to account to one another for what are known as "interconnection fees" (described below) based upon the duration of inter-network calls originating and terminating in each other's networks.

19.2.3. The structure and essential terms of an interconnection agreement are generally the same from one territory to the next, especially where the same parties are negotiating interconnection in a successive series of territories in one region, as in the present case. As described further below, specific statutory and regulatory provisions govern the form and content of interconnection agreements, which often also require formal approval from the relevant local telecommunications regulator.

20.    The fundamental importance of prompt interconnection to effective competition is recognised in each of the statutory licensing and regulatory regimes introduced in the Territories as part of the process of liberalisation of telecommunications markets

which took place during the Relevant Period. The specific provisions relating to the process of interconnection, including the respective network operators' rights and responsibilities, are described in detail for each of the Territories in **Schedules "B1"** to **"B7"** attached hereto.

21. The common feature of the relevant statutory regimes is that the incumbent network provider (here C&W) is under an obligation (1) to facilitate - and specifically not to delay, obstruct or impede - the process of interconnection with any proposed new network provider(s); (2) to permit interconnection in a non-discriminatory manner and in the interests of permitting and promoting effective competition in the relevant market for telecommunications services; and (3) to perform all - and specifically not to contravene or breach any - of the terms and conditions of the relevant network operating licence(s). Further, the relevant statutory duties imposed upon C&W relate to both physical interconnection and contractual interconnection (as described above). Such duties are intended to protect new entrants to the relevant telecommunications market (i.e. prospective or actual licence-holders) without whom there could be no competition. As such, a new entrant such as Digicel in each of the Territories is entitled to enforce C&W's statutory duties in relation to interconnection and/or seek compensation in private law for losses suffered by reason of C&W's breach or breaches of any such duties.

22. As pleaded separately below in relation to each of the Territories, breaches of such duties have been committed by the Local C&W Companies and CWWI itself (as the case may be) pursuant to a conspiracy and/or common design between the relevant parties within C&W.

**Background to relevant events in the Territories**

23. Digicel first identified a potential commercial opportunity in the Caribbean telecommunications markets in about 2000. At that time, the movement towards liberalisation and introduction of competition across the region was underway, although (as summarised in **Schedule "A"** hereto and described further below) the process of reform and liberalisation in each of the Territories took a number of years,

occurring at a different pace and during different parts of the Relevant Period.

24.     In particular, Digicel identified a potentially lucrative opportunity in the mobile telephones markets in this region, based upon:

24.1    the fact that there was at the time relatively low take-up (or market penetration) for mobile telephones and telephones generally, especially within the local residential population; and

24.2    the fact that Digicel would be able to offer more modern technology and a better/fuller service than C&W could offer with their existing networks, including all-digital mobile networks (as the name "Digicel" connotes), packaged services, GSM coverage and an international roaming facility.

25.     Digicel recognised the importance of achieving a quick launch in a new market, not least because a potential subscriber who has no telephone subscription is far easier to sign up than one who already has a subscription (often involving a term contract) with another network operator.   This was especially the case where Digicel's launch coincided with a peak time of the year for purchase of mobile handsets and making of telephone calls (domestic and international), most notably the period leading up to and including Christmas, New Year and Carnivals.  Digicel also planned to launch its new mobile networks, so far as possible, ahead of any third party competitors' launch dates, so as to optimise prospects of market penetration.

26.     Digicel's first entry into the mobile telecommunications market in the Caribbean took place in Jamaica during 2000/2001.  Digicel operated through a local company called Mossel (Jamaica) Limited ("Mossel").  In March 2000, Mossel was granted relevant licences to create and operate a mobile telephone network in Jamaica pursuant to the Telecommunications Act 2000.    By April 2001 Mossel had successfully interconnected with the existing network owned and operated by C&W (acting locally through a separate entity, "C&W Jamaica"), albeit after experiencing some initial resistance and procrastination on the part of C&W.  The parties signed an interim interconnection agreement on 30 November 2000 and a final interconnection agreement on 18 April 2001.  Thereafter, Digicel established its new GSM mobile

network rapidly in Jamaica and achieved a high degree of market share very quickly.

27.     Following their successful launch in Jamaica, Digicel planned to expand into countries affiliated with the Organisation of East Caribbean States ("OECS"), including St. Lucia, SVG and Grenada, as well as expanding into other countries in the Caribbean, including, for example, T&T, Barbados and Guyana. Digicel's expansion plans were intended to take advantage of the wave of liberalisation of telecommunications markets spreading across the region at the time. The commercial opportunities for Digicel were significant given the relatively low level of mobile subscription penetration achieved by C&W in the region and the reportedly high level of customer dissatisfaction with the service provided by C&W in the region at that time.

28.     To this end, Digicel created operating subsidiaries in the Territories (as identified in **Schedule "A"** hereto) and entered into negotiations with the relevant governments and/or regulatory authorities in the Territories with a view to seeking the grant of operating spectrum and statutory licenses or concessions (as required) to set up and operate a mobile telecommunications network. As more fully set out in **Schedules "B1"** to **"B7"** hereto, in relation to each of the Territories, Digicel also requested interconnection with C&W's existing networks at the earliest available opportunity, only to be met with a coordinated campaign of delay and obstruction on the part of C&W.

29.     Prior to or during the first quarter of 2002, and as a reaction to Digicel's successful entry into the Jamaica mobile telecommunications market and further expansion plans within the Eastern Caribbean (as summarised above), C&W produced or caused to be produced an internal strategy report, although C&W have been unable to explain the provenance of such document to date (see C&W's response to Part 18 Request 85 made by Digicel on 7 January 2008). This report dealt with the threat posed to C&W by Digicel's expansion plans within the region, the tactics which C&W should adopt and steps which C&W should take in order to deal with such threat (including a section entitled "*Raising the barrier of entry for Digicel*"), and the improvements and investment needed to C&W's own infrastructure and service in such markets which

would be facilitated by delaying Digicel's entry into the market for as long as possible.

30.    The basic thrust of this report was that C&W was in a vulnerable position: it was not ready for competition and it had been caught off-guard by Digicel's rapid and unforeseen success in Jamaica.   C&W expected Digicel to repeat that success throughout the Territories, starting in the OECS (St. Lucia, SVG and Grenada) if not impeded.   In order to buy time in which to create a sustainable defence to competition in the future, C&W needed to do whatever they could to impede Digicel's entry to market. This inevitably meant delaying interconnection between C&W and Digicel as part of what was described as *"CWWI's Interconnect Strategy"*.   Digicel will refer to the report in full, so far as may be necessary.

30A.   To the best of Digicel's current knowledge, pending disclosure and witness evidence in these proceedings, and based upon C&W's response to Request 92 of Digicel's Part 18 Requests made on 7 January 2008, a copy of the aforesaid internal strategy report was circulated to the following individuals within C&W at or about the time of its production in the first half of 2002: Robert Lerwill, Errald Miller, James Cheesewright, Winston Butler, Lisa Agard, Mark MacFee, Colin Little, Trevor Clarke, Thomas Perez-Ducy, John Thompson, Dave Morgan, Colin Shewry, Gary Barrow, Carl Roberts, Eddie Saints, Rudy Gurley, Ian Kyle, Sutcliffe Hodge, Timothy Adams, Donald Austin, Ricky Went, Dean Boyce, Vince Yearwood, Alan Dodds, Sandra Bodden, Stuart Jack, Vonciel Turner, Eugene Nolan, Greg Coogan, Rudy Ebanks, Timothy Adam and Sue Buckeridge.

## C&W's breaches of statutory duty in the Territories

31.    As particularised in **Schedules "B1"** to **"B7"** hereto, in breach of statutory duty in each of the Territories, C&W sought to delay physical and contractual interconnection by, amongst other things, (i) unreasonably ignoring and/or rejecting Digicel's requests for interconnection and/or Digicel's input on draft interconnection documentation and (ii) unreasonably failing and/or refusing to identify or order equipment required for interconnection, in each case for as long as possible.   C&W's strategy of deliberate

delay and obstruction was designed to keep Digicel out of the market for as long as possible and in order to improve C&W's own position within such market in the meantime.

31A.   As well as giving rise to (privately actionable) breach or breaches of specific obligations owed by the relevant C&W-related entity to the relevant Digicel entity under applicable telecommunications legislation in each of the seven territories (as set out, respectively, in **Schedules "B1" to "B7"** hereto), C&W's concerted and cynical conduct in adopting and subsequently implementing a strategy to delay interconnection with Digicel in the region also infringed specific competition legislation in two of the territories, as follows:

(1)    C&W's aforesaid conduct infringed and gave rise to a claim under the Fair Competition Act 2002 in Barbados (see **Schedule "B4"** hereto).   Although Digicel accept that any claim under the Fair Competition Act 2002 is time-barred, Digicel contend (so far as may be necessary) that the same nevertheless constitutes unlawful means for the purposes of their pleaded conspiracy claim in these proceedings.

(2)    C&W's aforesaid conduct infringed s.4(1) of the Protection Against Unfair Competition Act 1996 in T&T (see **Schedule "B6"** hereto) in that C&W (acting principally through TSTT for such purposes) acted and/or adopted practices contrary to honest practices in the context of the process of interconnection between (prospective competing) telecommunications network operators.

32.    The first instances of C&W's coordinated attempts to impede or frustrate Digicel's effective launch of new mobile networks occurred in the three related territories of St. Lucia, SVG and Grenada, all part of the OECS.   C&W delayed interconnection for a substantial period in these territories, despite having entered into a written agreement (acting through CWWI) with the Governments of the OECS under which C&W agreed that all telecommunications services in the OECS region would be fully competitive by April 2002. As described in more detail in **Schedule "B1"** hereto (St. Lucia) and **Schedule "B2"** hereto (SVG), C&W - which operated through CWWI in

St. Lucia and in SVG – delayed interconnection in both territories from about mid-2002 to early 2003. In both St. Lucia and SVG, the local regulatory authorities (NTRCs) intervened in December 2002/January 2003, following formal complaints made by Digicel in order to cause CWWI to resume negotiations. Having concluded Interconnection Agreements for both St. Lucia and SVG, C&W then unlawfully sought to re-negotiate certain rates agreed for such territories as a pre-condition to negotiating interconnection with Digicel in the third of these territories, Grenada, as set out in **Schedule "B3"** hereto.

33.   By way of overview of the interconnection process in each of the Territories and the delay caused by C&W to such process:

33.1   St. Lucia  (see **Schedule "B1"** hereto)

Digicel (acting through Digicel SLU) requested interconnection on 6 June 2002 immediately after being informed that it had been granted a mobile network operating licence within the territory (as anticipated by C&W in the 2002 C&W Internal Report), albeit such licence was not formally issued and dated until 6 September 2002. However, C&W (acting through CWWI) delayed interconnection and pushed back Digicel's estimated launch date from 6 September 2002 until 24 March 2003, i.e. a delay of over 6½ months. This delay deprived Digicel of a pre-Christmas launch in St. Lucia in 2002. Although Digicel accept that any claim for wrongdoing is time-barred as a matter of the law of St. Lucia, Digicel contend that their claim in conspiracy is governed by English law and therefore not time-barred and (so far as may be necessary) that even a time-barred breach of statutory duty constitutes unlawful means for the purposes of such conspiracy claim.

33.2   SVG  (see **Schedule "B2"** hereto)

Digicel (acting through Digicel SVG) requested interconnection on 6 June 2002 immediately after being informed that it had been granted a mobile network operating licence within the territory, albeit such licence was not

formally issued and dated until 12 September 2002. However, C&W (acting through CWWI) delayed interconnection and pushed back Digicel's estimated launch date from 12 September 2002 until 24 March 2003, i.e. a delay of almost 6½ months. As was the case in St. Lucia, this delay also deprived Digicel of a pre-Christmas launch in SVG in 2002.

33.3    Grenada  (see **Schedule "B3"** hereto)

Digicel (acting through Digicel Grenada) requested interconnection on 12 December 2002 following its successful application for a licence and again on 22 May 2003 (after Digicel's operating licence was formally issued within the territory on 20 May 2003). However, C&W (acting through C&W Grenada) delayed interconnection and pushed back Digicel's launch date back from 20 May 2003 until 17 October 2003, i.e. a delay of almost 5 months.

33.4    Barbados  (see **Schedule "B4"** hereto)

Digicel (acting through Digicel Barbados) requested interconnection on 12 March 2003 immediately following the grant of its operating licence within the territory, albeit such licence was not formally issued and dated until 8 August 2003. However, C&W (acting through C&W Barbados) delayed interconnection and pushed back Digicel's estimated launch date from 8 August 2003 to 11 February 2004, i.e. a delay of over 6 months. This delay also deprived Digicel of a pre-Christmas launch in Barbados in 2003.

33.5    Cayman  (see **Schedule "B5"** hereto)

Digicel (acting through Digicel Cayman) requested interconnection on 23 September 2003 after it had been informed that it would be granted a licence in Cayman, albeit such licence was not formally issued and dated until 17 October 2003 and did not permit the launch of a commercial mobile telecommunications network until 1 February 2004. Digicel estimated its launch date as 1 February 2004 on this basis. However, C&W (acting through

C&W Cayman) delayed interconnection and pushed back Digicel's launch date back from 1 February 2004 to 3 March 2004, i.e. a delay of over 1 month.

33.6   T&T (see Schedule **"B6"** hereto)

Digicel (acting through Digicel T&T) requested interconnection on 24 June 2005 immediately following the grant of its operating licence within the territory, albeit such licence was not formally issued and dated until December 2005. However, C&W (acting through and in conjunction with TSTT) delayed interconnection and pushed back Digicel's launch back from December 2005 to 6 April 2006, i.e. a delay of about 3 to 4 months. This delay deprived Digicel of a pre-Christmas launch in T&T in 2005. It also prevented Digicel from launching in time for the Carnival in T&T in February 2006.

33.7   TCI (see Schedule **"B7"** hereto)

Digicel (acting through Digicel TCI) requested interconnection on 19 August 2005 immediately following the grant of its operating licence within the territory, albeit such licence was not formally issued and dated until 31 March 2006. However, C&W (acting through CWWI, trading through a local branch) delayed interconnection and pushed back Digicel's launch date back from 31 March 2006 to 7 July 2006, i.e. a delay of over 3 months.

33A.   It is Digicel's case that C&W used the aforesaid periods of delay in order to take steps to improve their own position in the relevant telecommunications markets. Pending disclosure and witness evidence, it is understood that such steps took the form of (a) increased promotional activity on the part of the relevant C&W-related entity or entities designed to lock (new or existing) customers/subscribers into multi-year mobile telephone contracts, in particular in the traditionally busy periods leading up to Christmas and Festival times; and (b) improvements to the technical infrastructure operated and/or customer service provided by the relevant C&W-related entity or entities, in each case with a view to removing or reducing Digicel's potential

opportunities upon launching their competing mobile service in such markets.

**Conspiracy and/or Joint Tortfeasor Liability**

34.    The breaches of statutory duty on the part of the Local C&W Companies and/or CWWI (as the case may be), including infringement of competition legislation (as summarised above), were part of a collective and/or coordinated and/or common/joint act and/or effort on the part of C&W controlled centrally from London by CWWI and C&W plc at all material times. It is Digicel's case that some or all of the Defendants (including, in any event, CWWI) conspired together to this end with the intention of causing harm to Digicel.

34A.    For the avoidance of doubt, it is Digicel's case that such conspiracy was committed by some or all of the Defendants, those Defendants acting by individuals whose acts and/or states of mind or intention fall to be attributed to one or more of the Defendants for the purpose of establishing the elements of unlawful means conspiracy on the part of such Defendant(s):

(1)    Digicel rely upon an inference, which may reasonably be drawn from the known circumstances, to the effect that the conduct of the various C&W-related entities in each of the Territories was coordinated and/or controlled and/or influenced centrally by or through CWWI and/or C&W plc. In this context, Digicel refer to the following facts:

(a)    the overlap in directors, managers and relevant operational personnel between CWWI and/or C&W plc, on the one hand, and the Local C&W Companies, on the other hand – in particular, those comprising the C&W negotiating team which conducted interconnection negotiations across the Territories during the Relevant Period;

(b)    the importance to the C&W group as a whole and to C&W plc, in particular, as the senior public company heading such group, of protecting the income stream from C&W's traditionally lucrative

Caribbean telecommunications business;

(c)     the contents and circulation of the internal C&W strategy report referred to in paragraphs 29, 30 and 30A above; and

(d)     the similarity of the delaying behaviour on the part of the relevant C&W-related entities (including CWWI as the relevant fixed network licence-holder in St. Lucia, SVG and TCI) in each of the Territories during the Relevant Period, as set out more fully in **Schedules "B1" to "B7"** hereto.

(2)     Digicel do not yet know the identity of all those individuals whose conduct and/or state of mind or intention is to be attributed to each of the Defendants for the purposes of establishing the elements of conspiracy.  Based upon limited disclosure to date, Digicel contend at the present time (and pending further disclosure and witness evidence in these proceedings) that the individuals listed in **Schedule "C"** hereto were involved in this context during the Relevant Period.

35.     Further or alternatively, CWWI and C&W plc (as the case may be) took steps with knowledge and in furtherance of a common design and/or joint enterprise on the part of C&W (alternatively some or all of the entities comprising C&W for this purpose), namely the coordinated attempt to delay interconnection with Digicel in the Territories.  Paragraph 34A above is repeated in this context.  Pursuant to such common design and/or joint enterprise, one or other or all of the Local C&W Companies and/or CWWI itself committed tortuous or equivalent acts which caused loss and/or damage to Digicel, comprising some or all of the unlawful means referred to above.  In the premises, CWWI and C&W plc are liable to Digicel as joint tortfeasors even if (which is not accepted) they did not commit any tort themselves or act as principal on behalf of any other C&W-related entity which committed any relevant tort or torts.

**Loss and Damage**

36.     By reason of the matters set out above, the relevant Digicel entity or entities (as the case may be) has/have suffered loss and damage.

## PARTICULARS

The best particulars of loss and damage which can be provided at the present time are as follows:

36.1    Digicel lost revenue and/or profit and/or market share in each of the Territories as a result of the delayed launch of their new mobile networks as pleaded herein. Lost revenue includes the following:

    36.1.1. retail revenue from call charges which would have been incurred and paid by (new) customers during the relevant delay period in each territory;

    36.1.2. interconnection fees which would have been paid by C&W to Digicel in respect of inter-network calls originating on C&W's (fixed or mobile) networks during the relevant delay period in each territory; and

    36.1.3. increased levels of the above during the traditionally busy pre-Christmas and New Year periods during 2002-03 (St. Lucia and SVG), 2003-04 (Barbados) and 2005-06 (T&T) as well as traditionally busy Carnival times, including in 2006 (T&T).

In this regard, and pending disclosure, service of witness evidence and service of expert evidence in these proceedings, Digicel's current estimate for the loss of market share and loss of profit suffered in respect of each of the Territories is as follows:

**Delays, lost subscribers and financial losses**

| Territory | Delay (months) | Lost subscribers | Financial loss (US$k) |
|---|---|---|---|
| St Lucia | 6 | 26,917 | 9,933 |
| SVG | 6 | 21,973 | 6,960 |
| Grenada | 5 | 18,244 | 4,391 |
| Barbados | 6 | 42,967 | 13,897 |
| T&T | 4 | 270,389 | 49,757 |
| TCI | 4 | 7,137 | 3,174 |
| Cayman | 1 | 4,777 | 13,743 |
| **Total** | | **392,402** | **101,855** |

36.2   Digicel incurred additional costs and expenses as a result of the unlawfully protracted process of interconnection in each of the Territories.  Particulars will be provided in due course.

36.3   Digicel incurred additional costs and expenses as a result of their delayed launch in each of the Territories.  Particulars will be provided in due course.

36.4   Digicel suffered lost management and staff time seeking to deal with C&W's unlawful conduct (as described above) and/or investigating the existence and extent of such unlawful conduct during the Relevant Period.  Particulars will be provided in due course.

37.   Digicel are accordingly entitled to and claim damages from C&W as compensation for such loss and damage.  Digicel reserve their rights in relation to claiming further heads of loss and/or providing further information in respect of the heads of loss identified above.

38.   Further or alternatively, Digicel seek damages from C&W on a restitutionary basis representing the financial gains made and/or benefits obtained directly or indirectly by C&W as a result of their unlawful conduct pleaded above.  Such claim is pursued in so far as (1) C&W's relevant gain/benefit exceeds Digicel's own loss recoverable under compensatory principles or (2) Digicel are unable to establish (contrary to the claim pleaded above) the precise measure of their recoverable loss under compensatory principles.

39.   In support of their claim for restitutionary damages, Digicel seek an order for appropriate accounts and inquiries to be conducted in respect of all financial gains and benefits made/obtained directly or indirectly by C&W by reason of the unlawful conduct pleaded above. Digicel will seek appropriate directions for the conduct of such accounts and inquiries in these proceedings, including permission to adduce expert forensic accounting and/or telecommunications industry evidence to facilitate such procedures.

40.   Further or alternatively, Digicel seek an award of exemplary damages from C&W on the basis that during the Relevant Period C&W deliberately and cynically calculated that they would (probably) stand to gain from their unlawful activities to a greater extent than Digicel would suffer (or be able to establish as recoverable loss under applicable compensatory principles) by reason of such wrongdoing.

41.   Further, the Claimants are entitled to and claim interest, pursuant to Section 35A of the Supreme Court Act 1981, on such amount(s) found to be due, at such rate(s) and for such period(s) as the Court shall think fit.

**AND THE CLAIMANTS CLAIM:**

(1)     Compensatory and/or restititionary damages for breach of statutory duty and/or conspiracy to commit breach of statutory duty, to be assessed;

(2)     Accounts and inquiries in respect of all gains made and benefits received directly or indirectly by C&W as a result of their unlawful conduct during the Relevant Period as pleaded herein;

(3)     An award of exemplary damages in such amount as the Court shall think fit;

(4)     Interest, pursuant to Section 35A of the Supreme Court Act 1981, to be assessed;

(5)     Further or other relief.

**GORDON POLLOCK Q.C.**

**STEPHEN HOUSEMAN**

**GORDON POLLOCK Q.C.**

**HUW DAVIES Q.C.**

**STEPHEN HOUSEMAN**

**STATEMENT OF TRUTH**

The Claimants believe that the facts stated in these Amended Particulars of Claim are true.

Colm Delves
CEO, Digicel Group

Dated this   27ᵗʰ   day of March 2008 by Jones Day, Solicitors for the Claimants, of 21 Tudor Street, London EC4Y 0DJ.

This is Exhibit "B"
referred to in the affidavit of NICHOLAS PAUL COTTER
sworn before me this 23rd day of January 2009


Notary Public
London, England
(RUTH M. CAMPBELL)

**My Commission Expires with Life**

January 23, 2009

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

|  |  |
|---|---|
| **IN RE APPLICATION OF DIGICEL LIMITED ET AL. FOR AN ORDER TO CONDUCT DISCOVERY FOR USE IN A FOREIGN JURISDICTION PURSUANT TO 28 U.S.C. § 1782** | **Civil Action No.:** |

**EXHIBIT B TO AFFIDAVIT OF NICHOLAS PAUL COTTER**

# SCHEDULE B4/BARBADOS

1.    **RELEVANT PARTIES/INDIVIDUALS, OPERATING LICENCES & KEY DATES**

**Digicel**

1.1    Digicel operated in Barbados through Digicel Barbados (as defined in **Schedule "A"**). References to "Digicel" below are to be construed in this context.

1.2    As described in **Part (3)** below, and as material to the allegations in these proceedings, the following key individuals were mainly responsible for representing Digicel in Barbados during the Relevant Period:

(a)    Donal O'Shaughnessy ("DOS") – CEO, Digicel Barbados

(b)    Donald Connor ("DC") – Regulatory Affairs Manager

(c)    Richard Doyle ("RD") – Head of Technical

(d)    Liam McDermott ("LMcD") – Business Development Director

(e)    JD Buckley ("JDB") – Operations Director

(f)    Ian Thrush ("IT") – Pricing Analyst

(g)    Ciaran Black ("CXB") – Regulatory Affairs Director

(h)    Desmond Evelyn ("DE") – Technical Manager

1.3    The Government of Barbados informed Digicel on **10 March 2003** that its application for a mobile telecommunications licence had been successful. Digicel was awarded a Mobile Networks and Services Licence ("the Digicel Mobile Network Licence"), which was subsequently formalised in the form of an executed copy issued to Digicel on **8 August 2003**. It authorised Digicel to establish and operate a public cellular mobile telecommunications network/service within Barbados.

**C&W**

1.4     C&W operated in Barbados through C&W Barbados (as defined in the Particulars of Claim) and CWWI. At all material times, C&W Barbados and CWWI described themselves as "C&W" without making any distinction between themselves or each other and C&W (as defined in the Particulars of Claim).  References to C&W below should be understood in this context.

1.5     As described in **Part (3)** below, and as material to the allegations in these proceedings, the following individuals were mainly responsible for representing C&W in Barbados:

(a)     Donald Austin ("DA") – President and CEO of C&W Barbados

(b)     Geoff Batstone ("GB") – Senior Regional Regulatory Advisor

(c)     Clive Batchelor ("CB") – Carrier Manager, OECS and C&W Barbados

(d)     Laurence McNaughton ("LMN") – Regional VP, International Carrier Management (C&W Jamaica; C&W Barbados)CWWI

(e)     Chris Forrest ("CF") – Pricing Analyst/Manager, Carrier ServicesPricing

(f)     Paul Barnes ("PB") – Technical and Operations Manager for the Eastern Caribbean

(g)     Victor Taylor ("VT") – Account Manager, Domestic Carrier

(h)     Cleverston Miller ("CM") – Senior Engineer, Technology Operations

(i)     Pinkley Francis ("PF") – Service Provider Operations Manager

(j)     Richard Small ("RS")

(k)     Glenda Medford ("GM"), Vice President, Legal, Regulatory, and Public Policy, C&W Eastern Operations.

(l)     John Thompson ("JT"), Executive Vice President Carrier Services/Relations.

1.6   C&W was licenced to operate a fixed telecommunications network in Barbados pursuant to a Fixed Network and Services Licence ("the C&W Fixed Network Licence") and a mobile telecommunications network in Barbados pursuant to a Mobile Network and Services Licence ("the C&W Mobile Network Licence").

**Key Dates**

1.7   As set out below, Digicel requested interconnection with C&W on 12 March 2003 following confirmation that its application for a mobile telecommunications licence had been successful on 10 March 2003. However, C&W delayed interconnection with Digicel. The parties eventually entered into an interconnection agreement on 23 December 2003 which duly received regulatory approval on 14 January 2004 ("the Interconnection Agreement"). The delay to interconnection caused by C&W pushed back Digicel's original launch date from 8 August 2003 (when it formally received its licence to operate a mobile network in Barbados) until 11 February 2004, a delay of over 6 months which also deprived Digicel of a valuable pre-Christmas launch in Barbados during 2003.

2.   **RELEVANT STATUTORY, REGULATORY & LICENCE PROVISIONS**

**Telecommunications Act 2001 ("the 2001 Act")**

2.1   A carrier shall upon request from another carrier provide interconnection services: see **s.25(1)** of the 2001 Act. (Unless appears otherwise below, references are to sections in the 2001 Act.)

2.2   These services shall be:

(a)   offered at points, in addition to network termination points offered to end-users, subject to the payment of charges that reflect the cost of construction of additional facilities necessary for interconnection;

(b)   on transparent and non-discriminatory terms;

(c)   at charges and of service quality no less favourable than similar services provided by the interconnection provider for its own purposes, non-affiliated suppliers, subsidiaries or for similar facilities as provided;

(d)     made available in a timely fashion;

(e)     offered at cost-oriented charges;

(f)     and offered in such a way as to not require the requesting carrier to stand the cost of network components, facilities or services that are not required or have not been requested by that carrier (**s.25(2)**).

2.3     A request by a person for interconnection services must be in writing and contain sufficient information as is reasonably required by the existing provider to respond to the request (**s.28(1)**). If a Reference Interconnection Offer ("RIO") is in place and its terms and conditions are accepted by the person seeking interconnection, the parties shall sign an interconnection agreement in accordance with the terms of the RIO within 90 days of receipt of the request (**s.28(2)**). If the RIO is not accepted, the parties shall negotiate in good faith in order to reach an agreement on the terms and conditions of the interconnection and negotiations shall commence within 30 days of receipt of the request (**s.28(3)**).

2.4     An interconnection provider may refuse a request for interconnection if necessary to: protect the safety of a person; protect the security or integrity of its network; or due to the difficult technical and engineering nature of the interconnection (**s.28(4)**). A person seeking interconnection may refer a refused request to the Fair Trading Commission (the "FTC") for review (**s.28(5)**).

2.5     The terms and conditions of an interconnection agreement shall be reasonable as agreed between the parties through commercial negotiations, consistent with the RIO and, where there is no agreement, on such terms and conditions as the FTC determines (**s.25(3)**). With respect to dispute resolution, either party may refer to the FTC any dispute arising during the course of negotiating an interconnection agreement where all reasonable efforts have been made by the parties to resolve the dispute and the parties have negotiated in good faith (**s.31(1)**).

2.6     With respect to rates, the FTC shall establish an incentive based rate setting mechanism for determining rates to be charged by a provider in accordance with a policy of market liberalisation and competitive pricing (**s.39(1 – 3)**). The FTC shall regulate rates only where there is one provider of the service in question, the

Minister determines that there is a dominant provider or that the market is not sufficiently competitive (**s.39(5)**).

2.7 Any interconnection agreement shall be filed with the FTC within 30 days of the date of the agreement in order to be approved (**s.29(1)**). The FTC may approve the agreement or require it to be varied (**s.29(2)**) but any direction for variation shall be made within 30 days of an interconnection agreement being filed (**s29(3)**).

2.8 An interconnection provider may limit or terminate its agreement to offer interconnection services or may cease to offer those services in the interest of protecting the integrity of its telecommunications network; in the interest of protecting the safety of any person; or where the other party to the agreement fails to comply with the terms of the agreement (**s29(5)**). Where the interconnection provider takes any action pursuant to s29(5), in respect of the agreement, the other party to the agreement may refer to matter to the FTC for review (**s29(6)**). Where the FTC determines a review pursuant to s29(6) in favour of the other party, the other party may seek compensation for any financial loss incurred that resulted from the decision of the interconnection provider (**s29(7)**).

2.9 The Minister may suspend or revoke a licence and apply to the Court if the Minister first determines that a person has wilfully or repeatedly: failed to comply with the terms of its licence including the taking of such action as to have the effect of impacting negatively on the universal service obligation; or violated or failed to observe any provision of the 2001 Act or any rule or regulation made under the 2001 Act (**s.70**).

2.10 If the Court is satisfied upon an application by the Minister that any person has contravened any obligation/prohibition in the 2001 Act, or failed to comply with any rules made or order issued by the Minister, it may grant an injunction restraining the provider from engaging in any prohibited conduct or may order the provider to pay such pecuniary penalty as the Court thinks fit (**s.72(1)**).

2.11 The Act also creates a number of offences. First, a person who contravenes the condition of its licence or the provisions of the 2001 Act commits an offence and shall be liable on conviction on indictment to a fine of $500,000 or imprisonment for 5 years and a fine of $10,000 for each day the offence continues (**s.78(1)**).

Second, a person who knowingly obstructs or interferes with the sending, transmission, delivery or reception or any communication commits an offence and is liable on conviction on indictment to a fine of $250,000, imprisonment for up to 3 years or both and further fine of $10,000 for each day the offence continues after conviction (**s.82(1)**).

2.12    In terms of civil liability, if a person suffers financial loss or damage to property as a result of another person's:

    (a)    contravention of any of the obligations or prohibitions imposed by the 2001 Act;

    (b)    aiding, abetting, counselling or procuring the contravention of any provision of the 2001 Act;

    (c)    inducing by threats, promises or otherwise the contravention of any provision of the Act;

    (d)    being party to any contravention, or conspiring with another person to contravene, any provision of the 2001 Act;

then the contravening person must pay to that other person a reasonable amount as is agreed between the parties or, failing agreement, as determined by a court of competent jurisdiction (**s.73(1)**).

2.13    The Minister shall specify the interconnection policy (**s.4(2)(i)**).

**<u>Interconnection Policy</u>**

2.14    The Interconnection Policy was specified in accordance with s. 4(2)(i) of the 2001 Act.   The content of the Interconnection Policy broadly mirrors the relevant sections of the 2001 Act.

2.15    Interconnection will be undertaken on the following basis:

    (a)    The terms of interconnection will be agreed between operators on a commercial basis;

(b)     Interconnection agreements will be non-discriminatory and provide equal access;

(c)     Interconnection rates will be transparent and reasonable with regard to economic feasibility and must be cost based: see paragraph 1.3 of the Interconnection Policy. (Unless appears otherwise below, references are to paragraphs in the Interconnection Policy.)

2.16    Each telecommunications operator licensed as a carrier will be required to provide interconnection to requesting licensed carriers (**para. 2.2**). Interconnection should be allowed at any point of the network, which is technically practical to do so (**para. 2.3**).

### Telecommunications (Interconnection) Regulations 2003

2.17    The Regulations provide that no person shall be granted interconnection unless they hold a valid licence for the operation of a public telecommunications network and the provision of telecommunications services to the public (**Reg 4**).    An interconnection seeker must produce a valid carrier licence as of the date the interconnection commences (**Reg 7**).

### FTC Interconnection Guidelines – Accounting, Costing and Pricing Principles ("the Interconnection Guidelines")

2.18    The Interconnection Guidelines provide that the onus is on the dominant carrier to identify the feasible points of interconnection to the network: see paragraph 75 of the Interconnection Guidelines. (Unless appears otherwise below, references are to paragraphs in the Interconnection Guidelines.)

2.19    The burden of proof is on the dominant carrier to show that interconnection charges are calculated in accordance with the principles outlined in s25 of the 2001 Act (**para. 78**).

### Fair Competition Act 2002

2.20    All acts of trading practices prescribed or adopted by an enterprise, association of enterprises or a group of affiliated companies that result or are likely to result in the disruption or distortion of competition are prohibited: see s.31(1) of the Fair

Competition Act 2002.  (Unless appears otherwise below, references are to sections in the Fair Competition Act 2002.)  An "enterprise" includes a body corporate engaged in business but does not include any employee or officer of that body corporate.

2.21    Subject to certain limited exceptions, any agreements between enterprises, trade practices or decisions of enterprises that have or are likely to have the effect of preventing, restricting or distorting competition are prohibited and void (**s.13(2)**). This will include agreements containing provisions that:

(a)    directly or indirectly fix purchase or selling prices or determine any other trading conditions;

(b)    limit or control production, markets, technical development or investment; or

(c)    apply dissimilar conditions to equivalent transactions with other parties engaged in the same trade, thereby placing those other parties at a competitive disadvantage (**s.13(3)**).

2.22    An agreement will not be void if the FTC is satisfied that (**s.13(4)(b)**):

(a)    it contributes to the improvement of production or distribution of goods and services or the promotion of technical or economic progress, while allowing consumers a fair share of the resulting benefit;

(b)    imposes on the enterprises concerned only such restrictions as are indispensable to the attainment of the objectives in paragraph (a) directly above; and

(c)    it does not afford such enterprises the possibility of eliminating competition in respect of a substantial part of the goods or services concerned.

2.23    No person shall give effect to an exclusionary provision in an agreement where the agreement is entered into or arrived at between persons any two or more of whom are in competition with each other and the effect of the provision is to prevent, restrict or limit the supply of goods or services to any particular person or class of

persons by all or any of the parties to the agreement or by an affiliated company (**s14(1)**).

2.24    Where the FTC determines that any agreement or trade practice referred to in s13 or s14 is anti-competitive, it shall serve notice on the parties whose agreement or trade practice is anti-competitive requiring them to cease the practice or terminate the agreement (**s15(1)**).    Any enterprise that fails to cease the anti-competitive agreement or practice within the period stipulated in the notice is guilty of an offence and liable to a fine of $500,000 or 10% of that enterprise's turnover (whichever is the greater) (**s15(2)**).

2.25    The abuse by an enterprise of a dominant position which the enterprise holds is prohibited (**s16(1)**).  An enterprise holds a dominant position in a market if, by itself or together with an affiliated company, it occupies such a position of economic strength as will enable it to operate in the market without effective competition from its competitors or potential competitors (**s16(2)**).

2.26    An enterprise abuses its dominant position if it impedes the maintenance or development of effective competition in a market and in particular, but without prejudice to the generality of the foregoing, if it (**s16(3)**):

(a)     restricts the entry of any enterprise into that or any other market that supplies or is likely to supply a substitute for the good or service supplied in that market;

(b)     prevents or deters any enterprise from engaging in competitive conduct in that or any other market;

(c)     eliminates or removes any enterprise from that or any other market;

(d)     directly or indirectly imposes unfair purchase or selling prices that are excessive, unreasonable, discriminatory or predatory; or

(e)     uses any other measures unfairly in its trading operations that allows it to maintain dominance.

2.27    An enterprise shall not be treated as abusing a dominant position (**s16(4)**):

    (a)    if it is shown that its behaviour was exclusively directed to improving the production or distribution of goods or to promoting technical or economic progress and consumers were allowed a fair share of the resulting benefit; or

    (b)    the effect or likely effect of its behaviour in the market is a result of its superior competitive performance.

2.28    No person shall conspire, combine, agree or arrange with another person to limit the facilities for transporting, producing, manufacturing, storing or dealing in goods or services; or otherwise unduly restrict or injure competition (**s34(1)**).

2.29    Where the FCT has reason to believe that an enterprise has abused or is abusing a dominant position, the FTC shall direct the enterprise to cease the abusive practice within a specified period (**s17(2)**).

2.30    Where the Court is satisfied upon an application by the FTC that a person has contravened any of the obligations or prohibitions as set out above, or failed to comply with any direction of the FCT, the Court may grant an injunction restraining the person from engaging in that conduct (**s37(1)**). In addition, the Court may order the payment of compensation to a person who has suffered loss as a result of any anti-competitive agreement or trade practice (**s37(3)**).

2.31    Where a person contravenes any of the provisions above, or refuses or fails to comply with a direction or order of the FTC, is guilty of an offence and, where no other penalty has been imposed in respect of that offence, that person shall be liable on conviction on indictment to a fine of $500,000, imprisonment for a term of 6 months or both (**s43(1)**).

2.32    Every person will be liable in damages to another person for any loss caused to that person as a result of the following conduct (**s44(1)**):

    (a)    contravention of any of the obligations set out above;

    (b)    aiding, abetting, counselling or procuring a contravention of any provision set out above;

(c)     inducing by threats, promises or otherwise a contravention of any provision set out above;

(d)     being knowingly concerned in or a party to a contravention of any provision set out above; or

(e)     conspiring with any other person to contravene any provision set out above.

2.33     Any civil action brought in accordance with s44(1) shall be brought within 3 years from the time the cause of action arose (**s44(2)**).

**Memorandum of Understanding 2001 ("MOU 2001")**

2.34     Dated **16 October 2001**, a MOU 2001 signed by the Government of Barbados, Cable & Wireless BET Limited and Cable & Wireless BARTEL Limited, outlined the conditions under which C&W would surrender its exclusive licences ahead of its agreed termination date 2011. Schedule 5 to the MOU 2001 makes reference to general telecommunications principles. The schedule states that the existing legislative regime would be replaced in order to facilitate the liberalisation of the telecommunications industry in Barbados.  C&W was consequently fully aware of the implications of telecommunications liberalisation in Barbados from at least this date, October 2001.  In particular:

(a)     It had agreed that full competition and liberalisation in Barbados was timetabled to start from 1 August 2003 (at the start of Phase 3 "Full Liberalisation" in the Transition Timetable in Schedule 2 of the MOU 2001);

(b)     Before then, it had agreed that Phase 1 of the Transition Timetable (to take place from December 2001 to November 2002) entailed competition in the mobile telecommunications market and interconnection to C&W's domestic network; and,

(c)     C&W, therefore, had considerable time to prepare for the liberalisation of the Barbados market and the interconnection that it would be required to provide to new entrants (including preparing the necessary documentation

that would be required for this and associated materials such as appropriate costs models).

2.35    As the aforesaid provisions of the relevant primary and secondary legislation in Barbados make clear:

(a)    Physical interconnection (as described in the Particulars of Claim) is required to take place in a timely fashion and on non-discriminatory terms. The grounds for lawfully refusing interconnection or restricting access to or sharing of existing network infrastructure are strictly circumscribed. See in particular: sections 25 and 28 of the 2001 Act and the Interconnection Policy, as summarised above.

(b)    Contractual interconnection (as described in the Particulars of Claim) is required to take place in a timely fashion, in good faith, and on non-discriminatory and reasonable terms. This is reinforced by the machinery for dispute resolution through the regulatory body. See in particular: sections 25 and 31 of the 2001 Act and the Interconnection Policy, as summarised above.

## 3.    CHRONOLOGY OF RELEVANT EVENTS

Unless otherwise stated below, matters quoted or summarised from the contents of communications made or sent by or on behalf of Digicel are relied upon for their truth.

### Pre-Interconnection

3.1    On **10 March 2003**, the Ministry of Economic Development in Barbados announced that Digicel's application for a licence had been successful. Digicel (LMcD) submitted its formal request for interconnection services to C&W (DA) by letter dated **12 March 2003**. The purpose of this request was (at the very least) to facilitate the interconnection process in the spirit of the 2001 Act and Barbados' international telecommunications liberalisation commitments. Digicel stated that it expected physical and technical interconnection to be established within 3 months and proposed a meeting in the week beginning 17 March 2003 to determine timeframes, establish a schedule of meetings and assign responsibilities between the

parties. Digicel also requested that C&W provide it with information regarding the equipment necessary to interconnect with C&W's established network.

3.2     C&W (DA) responded to Digicel's request stating in a letter to Digicel on **14 March 2003** that C&W had not been told by the Minister that any entity had been granted a licence under the 2001 Act and asked Digicel to send it a copy of the Digicel Mobile Network Licence.  It was implicit from its response, as it later expressly confirmed, that C&W was refusing to negotiate interconnection with Digicel until the latter was in possession of a formal executed licence.  The refusal by C&W to engage with Digicel in this respect was unreasonable, particularly in the light of the MOU 2001 that it had entered into with the Government of Barbados to the effect that there would be competition in the mobile telecommunications market (including interconnection with C&W's domestic network) from December 2001, and that C&W was in breach of its relevant statutory obligations (such breach including breaches of ss.25 and 28(3) of the 2001 Act and ss16(1) and 34(1) of the Fair Competition Act 2002).  The phrase "breach of its relevant statutory obligations" shall mean such (non-exhaustive) breaches throughout this Schedule.

3.3     C&W's unwillingness to begin discussions was reiterated in a letter dated **10 April 2003** from C&W (GM) to Sunbeach Communications (an entity that had also been successful in its application for a mobile network licence).  C&W stated that it believed discussions with new entrants on infrastructure sharing and co-location would be premature prior to new entrants being issued with licences and refused to attend a meeting scheduled by the Ministry for the following day to be attended by all new entrants (Digicel, Sunbeach Communications, AT&T) and C&W.  Such refusal was unreasonable and in breach of C&W's relevant statutory obligations for the reasons set out in paragraph 3.2 above.

3.4     Frustrated by C&W's refusal to commence interconnection discussions, Digicel (DOS) wrote to the FTC on **17 April 2003** informing the FTC of the slow start to negotiations with C&W, in particular C&W's insistence on seeing copies of the granted licences before any discussions could take place.

3.5     Digicel (LMcD) wrote to C&W (DA) in by a letter dated **14 May 2003**, in order to remind C&W of its obligations under s28(3) of the 2001 Act, as two months had

elapsed since Digicel's initial request to commence negotiations._ Digicel also requested a copy of C&W's standard interconnection agreement and requested a meeting between the parties on 28 May 2003 to commence negotiations.

3.6     In a letter dated **23 May 2003** C&W (DA) rejected Digicel's interpretation of its obligations under the 2001 Act. C&W claimed that a "person" under the 2001 Act meant a licensed carrier. C&W stated that it had been advised that licences had not in fact been issued to Digicel, and repeated the position set out in its 14 March 2003 letter. C&W attempted to justify failing to commence negotiations by claiming that the regulatory framework in Barbados was incomplete.

   (a)    C&W's stance was unreasonable for the reasons set out in paragraph 3.2 above and, further, that an incomplete regulatory framework (if factually true, which is denied) was not a statutory reason to delay commencing interconnection negotiations. C&W's conduct in this regard was in breach of its relevant statutory obligations.

   (b)    Digicel refuted C&W's interpretation of section 28 of the 2001 Act by letter dated 23 May 2003 in an email dated **5 June 2003**, correctly asserting that a "person" was defined as including an individual, a partnership, an unincorporated organisation, a Government or a Government Agency. Digicel correctly asserted that the 2001 Act made a distinction between 'persons' and 'carriers' in order to prevent such delaying tactics on the part of incumbent providers.

3.7     Digicel (DOS) wrote to C&W (DA) by letter dated **26 June 2003** requesting once more that the respective companies commence interconnection negotiations without further delay. In order to dispel any reluctance C&W may have had to enter into negotiations, Digicel highlighted the already established commercial relationships between Digicel and C&W group companies in Jamaica, St.Lucia, SVG and Grenada. Digicel stated that there was no legal impediment to the commencement of negotiations, especially with a company selected by the Government to operate a cellular service in Barbados. _Digicel proposed that the parties should meet no later than 4 July 2003 in order to commence interconnection negotiations. C&W (DA) responded to this letter on **30 June 2003**, stating that as the interconnection

framework in Barbados was unsettled, C&W was unable to commence negotiations with any proposed licensee.   C&W's refusal to engage with Digicel was unreasonable and in breach of its relevant statutory obligations for the reasons set out in paragraphs 3.2 and 3.6 above.

3.8    On **8 August 2003** Digicel formally received the Digicel Mobile Network Licence. By letter delivered by hand the same day, Digicel (DOS) wrote to C&W (DA) in order to, once again, request interconnection services from C&W.

3.9    A meeting between Digicel (DOS, DC, JDB, DE and RD) and C&W (LMN, PB, GB, VT, CM and CB) was held on **14 August 2003**.  Digicel asked for the immediate commencement of physical and technical interconnection.  C&W agreed to: provide Digicel with a non-disclosure agreement ("NDA") by 15 August 2003; provide Digicel with a draft Interconnection Agreement by 25 August 2003 (following the submission of its RIO to the FTC on 22 August 2003); provide Digicel with information on pricing (relating to the receiving party pays regime in place for fixed to mobile services in Barbados); and inform Digicel of its stance on ordering the necessary equipment prior to the agreement of commercial terms of interconnection and execution of the Interconnection Agreement. On this latter issue, Digicel suggested three alternatives: (1) the use of equipment decommissioned by C&W in Jamaica; (2) that Digicel would order and purchase the equipment on C&W's behalf; (3) or that Digicel would put a bond in place to cover the cost of the equipment ordered by C&W.  By that time, Digicel had already been informed by the Ministry that it had written to C&W and stated that they must proceed with physical and technical interconnection with the three new operators immediately.  However, C&W declined to give a date by which it would take this decision, which Digicel informed C&W was tantamount to a refusal to proceed with physical and technical interconnection.   The positions adopted by C&W at this meeting were unreasonable and in breach of its relevant statutory obligations. Digicel relies on the following:

(a)    Interconnection Documentation (including the NDA).   C&W had already had considerable time to prepare for liberalisation of the telecommunications market (which it had agreed to pursuant to the MOU 2001 in October 2001) and was specifically on notice of Digicel's

requirement in this respect from March 2003.  It had previously prepared interconnection documentation in its dealings with Marpin in Dominica in or around 2001 and with Digicel in Jamaica (April 2001) and the OECS (St Lucia and St Vincent and the Grenadines) (2002-2003) and Grenada (earlier in 2003)).  These agreements would not be materially different to those to be submitted to the FTC and Digicel for interconnection in Barbados (indeed, the documentation ultimately provided to Digicel was very similar to that negotiated and agreed with Digicel in the OECS).   In view of the considerable time for which C&W was on notice of liberalisation (generally) and interconnection with Digicel (specifically), the NDA and the RIO (which consisted of the draft interconnection documentation) should have been submitted to Digicel at the time of its first request for interconnection on 12 March 2003, and certainly at or before the meeting on 14 August 2003.  Furthermore there was no reason why the RIO could not have been provided to Digicel on 22 August 2003 (when it was submitted to the FTC) instead of on 25 August 2003.  C&W's failures in this respect were wholly unreasonable.

(b)    Tariff Schedule.  The Tariff Schedule, in particular, was a short but crucial document in the context of interconnection, which could be quickly and easily generated from a cost model.  In addition to the advance notice of liberalisation generally provided by the MOU 2001, the requirement for cost-oriented rates had come into effect in the 2001 Act, with C&W carrying the burden of demonstrating the same. So C&W had received considerable notice of the need to create a cost model permitting the rapid derivation of such rates in a tariff schedule (and, as noted above, was on notice of Digicel's specific requirement for such since March 2003).  After the OECS interconnection processes, C&W would have realised how important this schedule was to (and contentious in) the interconnection process. Further, such a cost model would also have been vital for C&W's general observation of its business.  There could be no legitimate excuse for the delay in its production in March 2003 or, latest, by 14 August 2003.  In fact, Digicel had to wait for many months before it received all the tariff

information it required for the Barbados interconnection process (as set out below).

(c)     Commencement of Physical Interconnection.  Given that:

(i)     C&W had been on notice of liberalisation from October 2001 (indeed, the MOU 2001 required full liberalisation by 1 August 2003, paragraph 2.34 above) and of Digicel's requirements in this respect from March 2003;

(ii)    C&W was aware from the interconnection processes that it had conducted with Digicel companies in Jamaica, St.Lucia and St.Vincent that Digicel considered that it was vital to run the physical interconnection process alongside the commercial interconnection process in order to complete overall interconnection in a reasonable timeframe.

(iii)   C&W had been informed by the Ministry that it was required to commence physical and technical interconnection with new entrants immediately;

(iv)    Digicel had formally received the Digicel Mobile Network Licence in August 2003;

(v)     Digicel's network build out was underway and it had sunk considerable money into Barbados in this respect;

(vi)    Digicel was in an established commercial relationship with C&W in Jamaica, St Lucia, St Vincent and the Grenadines and Grenada;

(vii)   The three alternatives suggested by Digicel (see above) removed any commercial risk for C&W of ordering the equipment; and

(viii)  If C&W truly believed there was a commercial risk and this could not be removed by Digicel providing a guarantee or performance bond, it could enter into an interim interconnection agreement with

> Digicel as it had done in Jamaica to allow interconnection to progress before all commercial issues were agreed,
>
> C&W's refusal to provide lists of necessary equipment immediately and to agree to order the equipment for Digicel's physical and technical interconnection with C&W's fixed network in March 2003 (14 August 2003 latest) was wholly unreasonable. Further, its refusal to even provide a date for its decision on this was simply a deliberate tactic to stall the interconnection process.

3.10 C&W sent an update email to Digicel on **19 August 2003**. In respect of any pre-ordering of equipment, C&W stated that once the RIO was submitted to the FTC C&W would make Digicel aware of its position. C&W's refusal to commit to ordering equipment was in breach of its relevant statutory obligations for the reasons set out in paragraph 3.9 above.

3.11 A meeting was held with the Telecommunications Sub Committee (including the Deputy Prime Minister) on ~~20~~19 August 2003, at which the need for immediate physical and technical interconnection was stressed in order to ensure timely liberalisation of the market. Digicel followed up by writing to the Deputy Prime Minister the same day highlighting the issue of physical and technical interconnection. Digicel was of the view that this should proceed independently of commercial interconnection, i.e. the negotiation of the Interconnection Agreement between the parties. Digicel stated that incumbent operators are reluctant, due to the alleged financial risk involved, to begin technical interconnection until after commercial interconnection has been concluded. Digicel stated that an indemnity agreement as offered by Digicel would eliminate this concern. Digicel also emphasised that failing to commence technical interconnection until after commercial interconnection has concluded would result in a delay of 14 weeks before a new entrant could launch its services, whereas if C&W were to commence physical and technical interconnection immediately, Digicel would be able to launch services immediately upon receipt of the FTC's approval of the Interconnection Agreement.

3.12    On **22 August 2003** C&W filed a RIO with the FTC and provided a copy to Digicel on **25 August 2003**.  This RIO could and should have been filed earlier and/or the interconnection documentation provided to Digicel earlier for the reasons set out in paragraph 3.9 above.  Certainly, there was no good reason to wait three days between filing the RIO and providing a copy to Digicel.  Such conduct was unreasonable and in breach of C&W's relevant statutory obligations.

3.13    In a letter dated **26 August 2003** Digicel (DOS) requested confirmation from C&W (CB) that it was willing to proceed with physical and technical interconnection ahead of signing the Interconnection Agreement, as C&W had filed a RIO with the FTC. In order to alleviate C&W's concern of incurring capital expenditure in ordering the interconnection equipment prior to the conclusion of negotiations being reached, Digicel once more proposed three solutions: (1) that C&W utilise existing equipment belonging to the C&W group that had been decommissioned in Jamaica; or, (2) Digicel would order and pay for the necessary equipment; or, (3) Digicel would enter into a guarantee or put in place an escrow arrangement in favour of C&W to cover the cost of the equipment to then be ordered by C&W.

3.14    Digicel (DOS) wrote to C&W (CB) on **27 August 2003** to request confirmation that C&W would commence technical and physical interconnection by 2 September 2003, and sought a response by 28 August 2003. In the absence of any response from C&W, on **29 August 2003** Digicel (DOS) wrote once more to the Deputy Prime Minister to provide an update on the progress of negotiations. Digicel stated that C&W had yet to provide Digicel with its response to any of the proposals for physical and technical interconnection advanced by Digicel nor had C&W offered any alternative proposal(s). Digicel explained that as the linking of the networks could take up to 14 weeks, any further delay in commencing physical and technical interconnection would prevent Digicel launching services in time for the lucrative Christmas market.  C&W's failure to respond to its letters of 26 August 2003 (referred to in paragraph 3.13 above) and 27 August 2003 was unreasonable (including for the reasons set out in paragraph 3.9 above) and a deliberate tactic to stall progress of the interconnection negotiations and/or process with Digicel in Barbados, and, as such, breached its relevant statutory obligations.

3.15    A further meeting was held between Digicel (DOS, DC, RD, DE and JDB) and C&W (CB, GB, PB, CM and VT) on **2 September 2003**. In the context of the ~~non-disclosure agreement ("NDA")~~ negotiations, C&W and Digicel discussed the extent to which they would be able to notify the public of the progress of the interconnection negotiations. It was agreed that sensitive commercial information would not be disclosed but that so-called 'high level' information about negotiations could be disclosed to the public. C&W agreed that it would re-draft the NDA as soon as possible, with a view to finalising the document by 5 September 2003.

(a)    At the meeting, C&W once again refused to proceed with physical and technical interconnection until the FTC had approved the Interconnection Agreement~~,~~. This was on the basis that it was not prepared to incur any capital expenditure before this time. DOS noted that C&W had not refused to do so in Jamaica and Digicel had provided C&W with three alternative solutions to achieve an early equipment order for interconnecting in Barbados. Digicel considered C&W's continued refusal to evidence a lack of good faith.

(b)    C&W's outright refusal to proceed with physical and technical interconnection was unreasonable (for the reasons set out in paragraph 3.9 above), was a deliberate tactic that formed part of its strategy to delay interconnection with Digicel in Barbados (effectively requiring the physical interconnection process to be added on to the end of the commercial interconnection process and, as such, delaying interconnection and Digicel's launch still further by the length of that additional process), and was a breach of its relevant statutory obligations.

(c)    At the meeting, C&W and Digicel ~~also~~ agreed that certain service description and tariff information would be provided by C&W to Digicel by 5 September 2003~~.~~ (or at least an update would be provided in this respect by that date). For the reasons set out in paragraph 3.9 above, it was unreasonable for C&W not to have provided full tariff schedules directly in response to the March 2003 interconnection request and, in any event, at latest by this meeting in September 2003. In addition, the refusal to provide

a date when the information would be provided (rather than a date when there would be just another update) was a further stalling tactic by C&W in the progress of the interconnection process.  Finally, the proposed tariffs that had been provided were unreasonable (being too high where they were to be paid by Digicel to C&W, such as tariffs for joining services).  Such tariffs were unreasonable and not cost-oriented as required by the 2001 Act. These failures and stalling tactics in relation to tariffs were breaches of C&W's relevant statutory obligations.

(d)     The next interconnection meeting was tentatively arranged for 18 or 19 September 2003.

3.16     In a letter to C&W (DA) dated **3 September 2003**, Digicel (DOS) once again made a request for the immediate commencement of physical and technical interconnection of the parties' networks. Digicel stated that a failure to answer the request by 5 September 2003 would be viewed as a refusal. C&W (DA) responded by letter dated **5 September 2003**, in which it altered the stance it had adopted to date: C&W advised that it was prepared to consider advanced ordering of the equipment necessary to effect technical and physical interconnection upon receipt of a suitable bond or cash deposit from Digicel.  C&W refused to commence the installation and testing of the ordered equipment until such time as the Interconnection Agreement had received regulatory approval, thereby enabling C&W to continue to delay liberalisation of the telecommunications market in Barbados.  C&W should have been prepared to order the equipment after the request for interconnection in March 2003, or, at latest, as soon as the three alternatives were suggested on 14 August 2003 removing any conceivable commercial risk for C&W (although Digicel does not consider there was any such risk for the reasons set out in paragraph 3.9 above).  C&W's various failures to do this before this correspondence were a breach of its relevant statutory obligations and caused a commensurate unlawful delay to interconnection.  Further, C&W's refusal announced on 5 September 2003 to install and test the equipment it was now prepared to order until after the Interconnection Agreement had received regulatory approval was yet another unnecessary and unreasonable position that was a further

part of C&W's deliberate tactics to delay Digicel's market entry and was a further breach of the same statutory obligations.

3.17   On **9 September 2003**, Digicel (DOS) wrote to C&W (DA) concerning the amount of the bond required by C&W before it would undertake physical and technical interconnection (it had already provided the proposed wording for an indemnity insurance bond from its bankers to C&W (CB) by this point and just needed to know the amount of the bond required).

3.18   On **10 September 2003** C&W requested that the next interconnection meeting be postponed by about 4/5 days, from 18/19 to 23 September 2003.  Digicel agreed and the meeting was eventually arranged for 24 September 2003.  This delay was for no valid reason, was unreasonable and part of C&W's strategy of stalling the interconnection process, and was in breach of C&W's relevant statutory obligations.

3.19   In a letter from C&W (JT) to Digicel (DOS) dated **18 September 2003**, C&W (JT) repeated that it was prepared to order the interconnection equipment prior to the Interconnection Agreement being approved by the FTC provided that Digicel first paid a cash deposit on account to be credited against amounts owed by Digicel for the joining service.   (C&W no longer offered to accept a suitable bond, as previously suggested in its letter of 3 5 September.)  C&W promised to provide the figure for the cash deposit by 22 September 2003.  C&W claimed that it was prepared to go against its ordinary practice and order the equipment prior to receipt of regulatory approval for the Interconnection Agreement as a result of requests from various stakeholders and in order to expedite telecommunications liberalisation.  The letter also stated that C&W would not warrant the timeframes for manufacturing and delivery of the equipment by Nortel and that upon arrival in Barbados the equipment would remain in bond in Customs until the Interconnection Agreement received regulatory approval.  C&W's conduct set out in this paragraph was unreasonable and also in breach of its relevant statutory obligations as:

(a)   A bond would have had the same commercial effect in reducing risk for C&W as a cash deposit.  It was therefore unreasonable for C&W now to demand a cash deposit when Digicel had already arranged a bond, especially

given its indication on 5 September 2003 that a bond would have been suitable and, furthermore using a bond in this situation would have been more appropriate as the exact cost of the equipment was unknown and the bond could cover the estimate (rather than Digicel having to make a cash payment for an uncertain sum).

(b)   There was no good reason to delay the date for giving the figure of the cash deposit to 22 September: C&W had been aware that it would need to order interconnection equipment and hence quantify this figure since the request for interconnection on 12 March 2003, or, at the very latest, immediately after 3 September 2003 when Digicel provided the list of equipment which it believed C&W should order.   C&W was simply stalling the interconnection process in this way.

(c)   There was no good reason for the equipment to remain in customs once it arrived in Barbados.  In the same way that there was no valid reason to refuse to install and test the equipment on its arrival, for the reasons set out in paragraph 3.16 above, there was equally no valid reason to leave it in customs pending approval of an interconnection agreement.   This was simply another stalling tactic in the interconnection process.

3.20   Digicel (DOS) wrote to C&W (CB) on **22 September 2003** and requested service description and tariff information that C&W had promised at the 2 September meeting to provide to Digicel by 5 September 2003.  -As indicated at paragraph 3.15 above, C&W had no valid reason for not providing this information at the meeting on 2 September 2003 given that it had been on notice of liberalisation generally in Barbados since October 2001 (when it signed the MOU 2001) and of Digicel's desire to interconnect since March 2003, which unreasonable conduct was a breach of its relevant statutory obligations.  Its continued failure to provide such information by 22 September 2003 was an on-going breach of the same obligations causing yet further delay to the interconnection process.

3.21   In an email dated **23 September 2003** C&W provided an update on the progress of a number of matters in the negotiations, including certain charges, rates and services, although C&W stated that the information was generally unavailable

and/or in the process of being collated.  C&W's continued failure to provide this information was unreasonable for the reasons set out in paragraph 3.20 above and also a breach of C&W's relevant statutory obligations.

3.22    The NDA was executed on **24 September 2003**, despite C&W having agreed that the document should be finalised by 5 September 2003.  This was another stalling tactic by C&W in the interconnection process, was unreasonable and also a breach of its relevant statutory obligations.

3.23    Although C&W promised to do so by 22 September, it was not until **24 September 2003**, and following a chaser letter from Digicel on **23 September 2003**, that C&W (CB) informed Digicel (DOS) in an email that the amount of the cash deposit required by C&W before it would order interconnection equipment was US$200,000. C&W stated that this figure was based on a forecast provided by Digicel.  The delay by C&W in providing this information was for no good reason and part of its strategy of stalling the interconnection process and was a breach of its relevant statutory obligations, (in particular, where C&W had told Digicel that the information would be provided by 22 September 2003).  Digicel further contends that the amount of the cash deposit requested was unreasonable, being inflated and in excess of the true cost of the equipment (which was evident by reference to the sums paid for the same equipment in the previous interconnection processes between Digicel and C&W).

3.24    A meeting was held between Digicel (RD, IT, DC, JDB and DOS) and C&W (GB, CB, PB and CM) on **24 September 2003**.  In respect of the early ordering of equipment necessary for technical and physical interconnection, the cash deposit option suggested by C&W was discussed.  Digicel questioned why C&W was insisting on a cash deposit when a bond had previously been considered acceptable. The C&W representatives at the meeting stated that this decision had been taken by senior management and was out of their control. The amount required was also discussed, but C&W were unwilling to move on the figure of US$200,000, despite Digicel indicating that the figure was too high, that it could purchase the necessary equipment for less, and that US$150,000 would be a more appropriate figure. Digicel also proposed that the civil works be undertaken alongside interconnection negotiations, but C&W was unwilling to agree to this at the time. Rates and tariffs

were otherwise the focus of discussions. In particular, Digicel had still not been provided with the incoming and outgoing international service schedules and tariffs and the mobile termination service schedule, despite C&W's earlier promise and Digicel's subsequent chaser. DOS also stated that the non-attendance of C&W's pricing manager at meetings thus far was unacceptable. In addition, Digicel raised the general point that the tariffs proposed for Barbados were higher than the OECS average and requested a justification for the differences. C&W's stance and conduct at the said meeting, outlined in this paragraph, were unreasonable and also in breach of its relevant statutory obligations as:

(a)     The demand for a cash deposit rather than a bond, and the inflated amount of this demand, were unreasonable for the reasons set out in paragraphs 3.19 and 3.23 above. The fact that Digicel was ultimately forced to provide a cash deposit of US$200,000 if it wanted physical interconnection to proceed does not make C&W's demands reasonable.

(b)     C&W failed to provide appropriately qualified staff at this meeting to explain the need for a cash deposit rather than a bond and to give proper pricing information. This meant that vital issues (such as in relation to pricing) could not be dealt with in the meeting which was a clear obstruction of the interconnection process. It is noted that C&W's pricing specialist had not been present at any of the interconnection meetings in Barbados up to this point in time.

(c)     Digicel had been waiting for the international service schedules and tariffs and the mobile termination service schedule since its interconnection request in March 2003, or, at latest, 8 August 2003, when this information was specifically requested (and, as noted in paragraph 3.9 above, it would have been reasonable for C&W to have prepared and provided such information in March 2003). Further, C&W had agreed on 2 September 2003 to deal with this by 5 September 2003 (see paragraph 3.15 above), and this had still not been provided when Digicel chased C&W on 22 September 2003 (see paragraph 3.20 above). Given the notice that C&W had generally received of liberalisation and Digicel's particular need for interconnection, it was unreasonable for this information still not to be available. It could and

should have been simple for C&W to provide it from a costs model. Further, C&W would not even provide a date by which the information would be available. This delay and obstruction by C&W was deliberate and part of its strategy to delay interconnection with Digicel.

(d)     The level of the proposed rates was unreasonable for the reasons set out in paragraph 3.15 above;

(e)     The stalling of civil works was unreasonable for the reasons set out in relation to the stalling of physical interconnection generally at paragraph 3.9 above.

3.25    Digicel (DOS) wrote to C&W (JT) on **25 September 2003**. The letter stated that despite failing to understand why C&W refused to install the equipment and instead wished to leave it inoperable until regulatory approval had been obtained for the Interconnection Agreement, thereby extending the delay to interconnection, Digicel was willing to sign C&W's letter of agreement in order to facilitate the early ordering of equipment. This was subject to certain counterproposals, including that: (1) in the event that C&W rejected Digicel's request to install and test the equipment prior to obtaining regulatory approval, the civil works should be commenced immediately so that it would be completed prior to receiving that approval; and (2) the amount of the cash deposit be adjusted to US$150,000 to accurately reflect the costs of the equipment and the civil works (as Digicel had calculated the value of the interconnection equipment to be US$128,000).

3.26    On **1 October 2003**, C&W (CB) wrote to Digicel (DOS) in response to Digicel's letter of 25 September 2003. C&W once again refused to install and test the equipment or commence the required civil works until the FTC had approved the Interconnection Agreement. C&W also sought to justify its figure of US$200,000 for the cash deposit on the basis that Digicel's calculations related only to the up-front element of joining service charges. The positions adopted by C&W in respect of delaying elements of physical interconnection pending entry into an interconnection agreement and its reliance on the deposit figure of US$200,000 were unreasonable for the reasons set out in paragraphs 3.9 and 3.23 above and were in breach of C&W's relevant statutory obligations.

3.27    In order to make progress towards achieving physical interconnection, on **2 October 2003** Digicel (DOS) wrote to C&W (DA) enclosing a cheque for Bds$400,000 (US$200,000) to cover the cash deposit required by C&W. Digicel demanded bi-weekly updates as to the delivery status of the equipment.

3.28    A meeting was held on **7 October 2003** chaired by Chelston Bourne of the Ministry of Industry & International Business and attended by representatives from C&W, Digicel, AT&T and Sunbeach (the latter two also being new entrants to the Barbados telecommunications market). A meeting held the previous week between C&W and the Prime Minister and Deputy Prime Minister of Barbados was discussed. C&W had stated at ~~this 7 October~~that previous meeting that physical and technical interconnection would take up to 25 weeks to implement. Mr Bourne stated that the timeframe was unacceptable and that the Government wished to have competition in the Barbados market by the end of 2003. Mr Bourne was of the view, and Digicel agreed, that 8 weeks should be sufficient to obtain delivery of the equipment and complete commissioning and testing so as to be ready for service. C&W responded by stating that Nortel (who C&W insisted upon using to provide the interconnection equipment) had provided a delivery timeframe of 16 weeks and a further 9 weeks would be required to install, commission and test the equipment. However, in a fax from Nortel to C&W (PB) produced at the meeting, and dated that day, Nortel stated that the timeline could be reduced to 10-12 weeks based on an accelerated order. Ultimately, C&W stated that the minimum timeline for delivery, installation and testing would be 16 weeks, meaning a launch date of the first week in February 2004 at the earliest. Digicel requested that C&W reconsider its refusal to install the equipment or undertake civil works prior to receipt of FTC approval as it calculated that by doing so interconnection could be achievable by the first week in December 2003.

(a)    The timeframes for interconnection proposed by C&W (and by Nortel through C&W) were unreasonable (being exaggerated), and were in fact designed to stall the interconnection process in order to keep Digicel out of the Barbados telecommunications market for as long as possible (including over the lucrative Christmas period). Indeed, Digicel ordered its end of the interconnection equipment ~~from Nortel~~(its MUX) on ~~10 October~~25 August

2003 (after it had received C&W's RIO, which it had been forced to wait for in order to be sure of the equipment type that C&W required of Digicel for interconnection) and this was delivered and cleared through customs by 9 October 2003 – a 6 week delivery period. Digicel achieved this delivery time period even though it was not a major Nortel customer. C&W, as a major Nortel customer, should have been able to obtain such equipment significantly faster if it had wanted to (although ultimately it took C&W over 12 weeks to obtain the same equipment, from 10 October 2003 to 7 January 2004, this was intentionally slow and part of its unreasonable strategy to stall the interconnection process in Barbados). This tactic was particularly the case where the proposal included postponing civil works and equipment commissioning until after regulatory approval of an interconnection agreement (which was unreasonable for the reasons set out in paragraph 3.16 above).

(b)     Digicel alleges that C&W's proposals were in breach of C&W's relevant statutory obligations.

3.29    C&W ordered the interconnection equipment from Nortel on **10 October 2003**. Its delay in ordering the equipment was unreasonable for the reasons variously stated above, had a commensurate impact on interconnection, and was a breach of C&W's relevant statutory obligations.

3.30    On **13 October 2003** C&W (CB, GB, PB, CM, VT, CF and PF) and Digicel (DOS, DC, RD, DE, IT and JDB) discussed interconnection via conference call. With respect to physical and technical interconnection, C&W confirmed that it had placed an order for the necessary equipment with Nortel on 10 October 2003. Digicel suggested weekly conference calls with Nortel, which had been used in Grenada, to ensure that the equipment was delivered and installed according to schedule (which was ultimately unreasonably refused by C&W, see paragraph 3.41 below). In addition Digicel highlighted that two months had elapsed since it had formally requested international incoming and outgoing services as part of its request for interconnection, yet C&W had failed to produce a service description or tariff schedule. In fact, C&W had also failed to provide Digicel with a service description or tariff schedules for a number of services. Digicel Mobile to/from

C&W Mobile.  Furthermore, IT asked C&W to explain why tariffs in Barbados were 4 to 6 times higher than in other countries in which Digicel had concluded interconnection agreements. By way of explanation, C&W's stated that no rebalancing of rates had occurred, costs in Barbados were considered higher, and the traffic profile was "different".  <u>C&W's conduct outlined in this paragraph was unreasonable and in breach of its relevant statutory obligations as:</u>

(a)  <u>The service description and tariff schedule for international incoming and outgoing services and the service description and tariff schedules for Digicel Mobile to/from C&W Mobile should have already been provided for the reasons given in paragraphs 3.15 and 3.24 above;</u>

(b)  <u>The tariffs that were proposed were unreasonable for the reasons set out in paragraph 3.15 above. Further, the reasons provided by C&W to justify the unreasonable tariffs were not supported by adequate information and could not justify the magnitude of the differences between the islands.</u>

3.31   By letter to Digicel (DOS) on **17 October 2003**, C&W (CB) finally agreed to commence civil works necessary to facilitate interconnection in advance of the Interconnection Agreement receiving regulatory approval. C&W stated that this was contrary to normal practice and that a non-refundable cash deposit, to be offset against the Joining Service costs, would be required from Digicel prior to commencement of any works.  <u>C&W should have agreed to do this earlier, pursuant to the request for interconnection in March 2003, or latest, when it agreed to commence physical interconnection prior to regulatory approval of the interconnection agreement. Its failure to do so was unreasonable and a breach of its relevant statutory obligations.</u>

3.32   On **23 October 2003** C&W (DA) wrote to Digicel (DOS) again regarding the commencement of civil works. C&W stated that it would commence works upon satisfaction of the following conditions: (1) payment of a cash deposit of Bds$75,000 by Digicel; (2) a site visit and a survey of the proposed route having been conducted; and (3) all Government or other approvals having been received. By return letter that day, Digicel (DOS) accepted the terms of C&W's offer to commence civil works, and enclosed a cheque payable to C&W as a non-refundable

deposit. _Digicel disputed C&W's decision not to install, commission and test the interconnection equipment until after regulatory approval had been received. Digicel was of the view that this was another deliberate attempt by C&W to delay the provision of interconnection services, thereby obstructing the liberalisation of the mobile telecommunications sector in Barbados and delaying the introduction of competition. Digicel stated that even if installation and testing were completed the interconnection equipment would be inoperable until FTC approval had been received.   Waiting until after this approval before installing and testing the equipment would unnecessarily add 6 weeks on to an already protracted timeline.—, which position and its consequence was unreasonable and a breach of C&W's relevant statutory obligations.

3.33    Digicel (DOS) wrote to the Hon. A Wood, Minister of Energy and Public Utilities, (the "Minister") on **28 October 2003** in order to provide an update on the progress of negotiations. Digicel expressed its concern over the following issues: (1) Nortel's statement that it would take 10 weeks to deliver the switching and optical equipment; and (2) C&W's refusal to install, commission or test the equipment until the Interconnection Agreement had been approved. Digicel estimated that as a result, technical and physical interconnection would not be completed until 19 February 2004. Digicel respectfully requested that the Government intervene with C&W and Nortel.

3.34    On 5 6 November 2003 another meeting was held between Digicel (RD, IT, DC, JDB, DOS and CXB) and C&W (GB, CB, VT, CM, PB and PF). C&W confirmed that it had ordered all necessary interconnection equipment, and that Nortel had advised that the forecast shipping dates were 6 and 12 December 2003, depending on the type of equipment. With respect to the civil works, C&W confirmed that following receipt from Digicel of Bds$75,000 by way of deposit, C&W would commence the works. Regarding the testing and installation of the interconnection equipment, C&W indicated that this could only occur once the RIO was signed. C&W also informed Digicel that it would require a service deposit of three months' usage charges. _Digicel objected to this requirement as a well established commercial relationship existed between companies in the parties. same groups, including Jamaica, St Lucia, St Vincent and the Grenadines and Grenada.

(a)  C&W's refusal to install and test the equipment in this manner was unreasonable and in breach of its relevant statutory obligations for the reasons set out in paragraphs 3.9 and 3.16 above.

(b)  C&W's insistence on the security deposit was also unreasonable as it would create an unnecessary financial obstacle to launching a mobile telecommunications service, was unnecessary in circumstances where other companies in the parties' groups were in on-going relationships and there was no evidence of commercial risk arising from this. Finally, it was a one-way deposit (for the benefit of C&W) in a two way creditor/debitor relationship (C&W would also owe Digicel interconnection fees in the relationship going forward). Such insistence was a breach of C&W's relevant statutory obligations.

(c)  Tariffs and services were otherwise the focus of the meeting, with C&W and Digicel disagreeing as to the rates that would be payable by one to the other for terminating the other network's customers' calls, with C&W's reliance on unreasonable rates being a breach of its relevant statutory obligations.

3.35   Digicel (DOS) wrote to C&W (CB) on **12** and **13 November 2003** and proposed termination rates, based primarily on those agreed between Digicel and C&W in Grenada and contained within the Interconnection Agreement for Grenada. Digicel proposed a reciprocal termination rate for fixed to mobile and mobile to mobile calls of Bds$0.50 per minute, and rates for fixed termination, emergency and transit which were in line with rates in St.Lucia, SVG, Grenada and Jamaica (rather than the ones that C&W were proposing for Barbados which were 3 to 4 times higher). Digicel proposed rates which would allow it to recover its costs of terminating calls on its mobile network received from C&W's fixed and mobile telephone networks. C&W's unreasonable rates proposals were set at levels which would prevent Digicel recovering its costs of call termination and so were anti-competitive and unreasonable and in breach of its relevant statutory obligations.

3.36   Digicel wrote to the Minister on **14 November 2003** to request the Government's intervention to ensure that C&W's interconnection rates did not squeeze out

sustainable competition. After providing examples of how competition would be negatively affected by C&W's proposed rates, Digicel requested that the Government ensure that C&W's rates be set on the basis of regional benchmarks until such time as a LRIC costing model was implemented by the FTC.

3.37    On **20 November 2003** Digicel (RD, IT, DC, DOS, CXB and DE) and C&W (GB, CB, VT and PB) attended an interconnection meeting.  Regarding the security deposit, Digicel stated that if C&W continued to insist on the provision of a deposit, Digicel would request a deposit from C&W as Digicel also faced a credit exposure to C&W (traffic flows being two ways).  C&W agreed to rethink its request. With respect to interconnection, Digicel sought confirmation that C&W would test the equipment once it arrived in Barbados. C&W reserved its position, but Digicel questioned this stance considering the deposit paid for the equipment being ordered and Digicel's agreement not to use the equipment for commercial traffic until after approval was given by the FTC. Otherwise, rates levels and services dominated the discussions, with C&W seeking to justify the large fixed termination and transit rates it proposed by claiming that Barbados' network was larger than those in the OECS islands and its profile and distribution of minutes is different.  C&W's stance and/or conduct at this meeting (as set out above) were unreasonable and in breach of its relevant statutory obligations:

(a)    There was no good reason for C&W to request this security deposit for the reasons set out in paragraph 3.34 above;

(b)    There was no good reason not to begin testing the equipment on its arrival for the reasons set out in paragraphs 3.9 and 3.16 above; and

(c)    C&W's proposed rates were unreasonable for the reasons set out in paragraphs 3.15, 3.30 and 3.35 above.  Further, although the rates were on occasions 3.5 times the equivalent rates in the OECS, C&W only gave general reasons for the differences and were not prepared to produce evidence, including the costs model to support this.  Digicel contends that such rates were not cost-oriented as required by the 2001 Act, not allowing Digicel to recover its costs and allowing C&W to recover more than its costs, and were, as such, in breach of C&W's relevant statutory obligations.

3.38    In an email dated **21 November 2003**, C&W (~~CF~~CB) indicated to Digicel (~~CB~~DOS and ~~GB~~DC) that C&W would strive to respond to Digicel's rate suggestions, as provided on 12 and 13 November, by 28 November 2003 and revise its international rates by 5 December 2003. In the same email C&W (CF) stated that it could not commit to replying within these deadlines due to the volume of other work that needed to be carried out. <u>It was unreasonable for C&W to still not be in a position to respond promptly to rates proposals when rates issues had been outstanding for so long (being contentious since 2 September 2003 – paragraph 3.15 above). This was a breach of its relevant statutory obligations.</u>

3.39    C&W (CB) confirmed in an email to Digicel (DOS) dated **28 November 2003** that C&W's contractors would commence the civil works necessary to install the Joining Service between the two switch locations on the following day. <u>This should have started when it was first requested and the failure to do so was unreasonable and in breach of C&W's relevant statutory obligations.</u> Regarding the timing of the next meeting between the parties, CB stated C&W needed more time to follow up outstanding action points and proposed a meeting for 9 December 2003, rather than during the next week~~.~~<u>, as had been agreed at the meeting on 20 November 2003. C&W's failure to offer prompt dates for the interconnection meeting was unreasonable given the amount of time the interconnection negotiations had been on-going and the delays that had occurred, and was in breach of C&W's relevant statutory obligations.</u>

3.40    On **2 December 2003**, all operators (including the parties) met with the Telecommunications Subcommittee chaired by the Deputy Prime Minister. The Deputy Prime Minister gave the operators 5 days to have negotiations concluded and agreements signed. Appropriate meetings were fixed for 8 to 13 December 2003.

3.41    On **5 December 2003**, C&W (PB) informed Digicel (RD) that the interconnection equipment would not now be sent to Barbados by Nortel until 19 December 2003**.** In response to this, on **10 December 2003** Digicel (RD) requested, by email to C&W (PB), regular conference calls with Nortel so as to establish the exact status of delivery and flight information for the interconnection equipment. By reply of email the following day, C&W (PB) refused and stated that no blame could be

attached to C&W for the delay in delivery of the interconnection equipment.  Such further delays were unreasonable, as was C&W's failure to prevent this (to the extent that delays were attributable to Nortel rather than C&W) or to manage the on-going process, and this was also in breach of C&W's relevant statutory obligations.

3.42    As required by the Deputy Prime Minister, five meetings occurred between AT&T, Digicel and Sunbeach (together, the "New Entrants") and C&W between **8** and **13 December 2003** to discuss the legal framework of an Interconnection Agreement and interconnection rates.  On **10 December 2003** negotiations came to a halt.  In a Joint Press Release, the New Entrants claimed that C&W had failed to provide interconnection rates that would allow for the introduction of cellular competition. Digicel contends that C&W's proposed rates were unreasonable for the reasons set out at paragraphs 3.15, 3.30 and 3.35 above and also a breach of its relevant statutory obligations.

3.43    The New Entrants prepared an Interconnection Status Report for the Deputy Prime Minister, dated **15 December 2003**, summarising the 8 to 13 December 2003 meetings. Regarding C&W's proposed interconnection rates, the New Entrants submitted that the offers were unjustifiably in favour of C&W and C&W had not accepted any counter proposals made by the New Entrants. The New Entrants proposed that interconnection rates should be benchmarked in line with the OECS average. The New Entrants claimed that C&W's proposal entailed charging 25% more than the average OECS rates for fixed termination services and paying the New Entrants 35% less than OECS rates for mobile termination services.  Digicel contends that such rates were not cost-oriented or reasonable for the reasons set out in paragraphs 3.15, 3.30 and 3.35 above and were in breach of C&W's relevant statutory obligations.  The Report went on to state that, in respect of physical and technical interconnection, the New Entrants had still not been formally told by C&W whether or not C&W agreed to install, commission and test the interconnection equipment upon its arrival into Barbados, rather than waiting for FTC approval for the Interconnection Agreement.  There was no reasonable basis for C&W to continue to take this position and C&W's conduct was in breach of its relevant statutory obligations.

3.44    As the negotiations required by the Deputy Prime Minister were unsuccessful, the parties met again with the Government's Telecommunications Subcommittee. C&W had a break out session when the rates were set by the Subcommittee and negotiated with C&W.  The New Entrants then had their own break out session with the Subcommittee in which the rates agreed by the Subcommittee with C&W were put to them and agreed.   In short, it took the direct intervention of the Subcommittee to force C&W finally to conclude negotiations.

3.45    The resulting Interconnection Agreement was entered into and dated **23 December 2003**.  This was filed with the FTC for approval on **29 December 2003**. The FTC approved the Interconnection Agreement on **14 January 2004** (the delay in FTC approval being caused by the Christmas holidays).

3.45A    As noted in paragraph 3.38 above, C&W's end of the interconnection equipment arrived on **7 January 2004**.  It was then installed and tested.

3.46    On **11 February 2004** Digicel finally launched its mobile operations in Barbados, 11 months after first requesting interconnection from C&W.  However, right up to actual launch, C&W created problems with the flow of traffic between the respective networks, unreasonably delaying interconnection in breach of C&W's relevant statutory obligations.  It also delayed signing off completion of physical and technical interconnection for no good reason, which unreasonable conduct was in breach of its relevant statutory obligations.

**Post-Launch**

3.47    Digicel will refer as necessary to events post-dating its launch in Barbados in so far as they show that C&W generally continued to implement its strategy of delay and obstruction as described in the Particulars of Claim. These events will be covered in witness statements served in these proceedings.

3.48    Even though Digicel makes no claim in respect of losses caused by events post-dating its launch in Barbados on 11 February 2004, C&W continued to take steps to frustrate Digicel's operations as part of the strategy of delay and obstruction which C&W had begun to implement in Barbados in 2003.

4. **SUMMARY OF ALLEGATIONS**

4.1    It is Digicel's case that C&W deliberately delayed physical and contractual interconnection in Barbados during the period from 10 March 2003 (when Digicel was informed that its application for a licence had been successful), alternatively 8 August 2003 (when the Digicel Mobile Network Licence was formally executed and issued to Digicel), and the conclusion of the Interconnection Agreement on 23 December 2003 and/or Digicel's launch on 11 February 2004.

4.2    As particularised in **Part (3)** above, ~~such~~C&W's strategy of deliberate delay ~~took the form (from time to time) of~~ and obstruction included the following unreasonable acts and omissions:

   (a)    C&W's refusal and/or failure to negotiate interconnection with Digicel following receipt of Digicel's interconnection request dated ~~10~~ 12 March 2003, including as described in paragraphs 3.2, 3.3, 3.4, 3.6 and 3.7 above;

   (b)    C&W's refusal and/or failure to identify the equipment required for physical interconnection between C&W and Digicel in Barbados, including as described in paragraphs 3.9, 3.10, 3.14, 3.15, 3.16 and 3.19 above;

   (c)    C&W's refusal and/or failure to order such interconnection equipment and/or carry out essential civil works in parallel with the parties' negotiations towards contractual interconnection, including as described in paragraphs 3.9, 3.10, 3.13, 3.14, 3.15, 3.16, 3.17, 3.19, 3.23, 3.24, 3.25, 3.26, 3.27, 3.28 and 3.29 above;

   (d)    C&W's failure to prepare or provide important documentation and/or information relating to the Interconnection Agreement,~~ ~~ within a reasonable period of time and/or notwithstanding promises that the same would be made available within specific time periods, including as described in paragraphs 3.9, 3.12, 3.15, 3.20, 3.21, 3.22, 3.23, 3.24 and 3.30 above;

   (e)    C&W's cancellation/rescheduling (for no good reason) of critical meetings and/or telephone conferences during which important aspects of the draft interconnection documentation and/or physical interconnection were

scheduled to be discussed between the parties, including as described in paragraphs 3.18 and 3.39 above;

(f)     C&W's failure to attend important interconnection meetings with appropriately qualified and/or senior representatives, including as described in paragraph 3.24 above;

(g)     C&W's failure to offer prompt dates for meetings required to progress interconnection negotiations, including as described in paragraphs 3.18 and 3.39 above;

(h)     C&W's adoption of inconsistent and contradictory bargaining positions, for example in relation to whether C&W would order interconnection equipment, or conduct civil works, prior to conclusion and approval by the FTC of an Interconnection Agreement; , including as described in paragraphs 3.9, 3.15, 3.16, 3.19, 3.24, 3.25, 3.26, 3.28, 3.31, 3.32, 3.34 and 3.37 above;

(i)     C&W's adoption of unreasonable bargaining positions, for example in relation to rates; including as described in paragraphs 3.9, 3.15, 3.16, 3.19, 3.21, 3.23, 3.24, 3.25, 3.26, 3.28, 3.30, 3.31, 3.32, 3.33, 3.34, 3.35, 3.36, 3.37, 3.38, 3.39, 3.42 and 3.43 above;

(j)     C&W's failure to commit to progressing draft interconnection documentation within a reasonable period of time, including as described in paragraphs 3.9 and 3.22 above;

(k)     C&W's refusal to de-couple physical and technical interconnection from agreement of the commercial terms of interconnection, including as described in paragraphs 3.9, 3.10 and 3.15 above.

4.3     InBy reason of the premisesmatters set out in paragraph 4.2 above and Part (3) above:

(a)     C&W breached its obligations in relation to physical and contractual interconnection with Digicel (a new network provider as from 10 March 2003, alternatively 8 August 2003) under the 2001 Act (as summarised in **Part (2)** above), in particular by: (i) deliberately and/or unreasonably